2024-1783

_____

**United States Court of Appeals
For the Federal Circuit**

_____

**ORTIZ & ASSOCIATES CONSULTING, LLC,**

*Plaintiff-Appellant*

**v.**

**VIZIO, INC.,**

*Defendants-Appellee*

_____

Appeal from the United States District Court for the
Northern District of Texas in No. 3:23-cv-00791, Judge
David C. Godbey.

_____

BRIEF OF APPELLANT
ORTIZ & ASSOCIATES CONSULTING, LLC

Attorneys for Appellant:

Ramey  LLP

/s/ William P. Ramey, III
William P. Ramey, III
Texas Bar No. 24027643
wramey@rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923

i

**The '299 Patent:**

1. A method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video monitor and multimedia projector for rendering of the video data at a selected rendering device, comprising:

receiving a request in a wireless data communication network from a wireless device (WD) to locate at least one data rendering device (DRD) in the form of at least one of a video monitor and multimedia projector for rendering video data selected at said WD, said request including WD location information;

said wireless data communication network identifying a physical location, operational readiness and rendering capabilities of at least one DRD for said WD based on the WD location information;

said wireless data communication network providing said WD with location information of at least one accessible DRD for selection by said WD; and

receiving from said WD via said wireless data communication network a selection of a DRD by entry of authorization code at a user interface on at least one of said WD and said DRD once the DRD is physically located, and video data selected from at least one of said WD or a server accessible by said WD for rendering at said DRD, wherein verification of the authorization code entered on the user interface causes said DRD to retrieve and render the video data.

2. The method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video monitor and multimedia projector for rendering of the video data at a selected rendering device of claim 1, further comprising:

controlling rendering of said video data on said DRD with the commands from said WD entered on the user interface.

3. A method of brokering data between handheld wireless devices and publicly available data rendering devices for rendering of the data at a selected rendering devices, comprising:

receiving a request at a network resource from a wireless device (WD) through a wireless communications network to locate at least one data rendering device

(DRD) that is available to and accessible by the public for rendering data selected at the wireless device, said request including WD location information;

said network resource determining the geographic location of said WD using at least one of GPS, accessed network identification, and network triangulation, and then identifying a physical location and rendering capabilities of at least one DRD for said WD based on the WD location information;

said network resource providing said WD with location information of at least one publicly accessible DRD for selection by said WD;

receiving from said WD at said network resource a selection of a DRD and data selected for rendering at said DRD; and

providing said video data to said DRD after an authorization code provided by said WD is verified by at least one of said DRD or said network resource.

4. The method of claim 3, wherein said DRD further comprises at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an ATM machine.

5. A system for brokering data between handheld wireless devices and data rendering devices for rendering of the data at selected rendering devices, comprising:

a network resource programmed to:

receive requests from wireless device through a communications network to locate at least one data rendering device located geographically near and lacking physical proximity to said requesting wireless device, wherein said data rendering device is to be used for rendering data selected through said requesting wireless device;

identify physical locations and rendering capabilities of at least one data rendering device that is available to and accessible by the public for said requesting wireless device based on geographic location information for said requesting wireless device as determined by at least one of GPS, network connection, and network triangulation;

provide said requesting wireless device with location information of at least one publicly accessible data rendering device for selection by said requesting wireless device to render the data selected through said requesting wireless device;

receive data rendering device selections from said requesting wireless devices and data selected for rendering at selected data rendering devices; and

provide at least one authorization code to said requesting wireless device, said at least one authorization code for entry at a user interface on at least one of said request on wireless device or on said selected data rendering device once said selected data rendering device are physically located;

wherein said data selected for rendering is transferred at the request of a user of said requesting wireless device to a selected data rendering device from a memory associated with said requesting wireless device, and wherein said data is transferred to said requested data rendering device for rendering and wherein said requested data rendering device renders said data after said at least one authorization code provided by said requesting wireless device is verified by at least one of said network resource and said requested data rendering device.

6. The system of claim 5, wherein said selected data rendering device includes at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector or an ATM machine.

**The '285 Patent**

1. A system for rendering data provided via a data communications network at the request of a wireless device, comprising:

a server in communication with at least one data rendering device (DRD), said at least one DRD including a user interface for receiving passcodes, the DRD registered with said server to access and receive data over a data communications network at the request of a wireless device (WD) for rendering of the data at the at least one DRD in response to a passcode associated with said WD being entered at the user interface;

memory in said server accessible by said DRD, said memory for securely storing data received by or on behalf of said WD and said passcode associated with said WD; and

wherein said server is configured to receive said data and said passcode associated with said WD from said memory and to render said data after at least one passcode is entered on said user interface that matches said passcode stored in said memory associated with said WD and provided to said DRD.

2. The system of claim 1, wherein said DRD further comprises at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an automatic teller machine (ATM).

3. The system of claim 1, wherein said passcode is provided wirelessly to said user interface by said WD.

4. The system of claim 1, wherein said passcode is alternatively provided to said sever by said WD, whereafter said data is transferred to said DRD and is rendered.

5. A system for rendering data provided via a data communications network at the request of a wireless device, comprising:

a server in communication with at least one data rendering device (DRD), said at least one DRD including a user interface for receiving passcodes, the DRD registered with said server to access and receive data over a data communications network at the request of a wireless device (WD) for rendering at the at least one DRD in response to a passcode associated with said WD being entered at the user interface;

memory in said server accessible by said DRD, said memory for securely storing data received by or on behalf of said WD and said passcode associated with said WD; and

wherein said server is configured to enable said DRD to be selected through a wireless communications network by the WD from more than one DRD registered with said server and to receive said data and said passcode associated with said WD from said memory to render said data after at least one passcode is entered on said user interface that matches said passcode stored in said memory, provided to said DRD, and associated with said WD.

6. The system of claim 5, wherein said DRD further comprises at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an automatic teller machine (ATM).

7. The system of claim 5, wherein said passcode is provided wirelessly to said user interface by said WD.

8. The system of claim 5, wherein said passcode is alternatively provided to said sever by said WD, whereafter said data is transferred to said DRD and is rendered.

9. A system for rendering data provided via a data communications network at the request of a wireless device, comprising:

a server in communication with at least one data rendering device (DRD), said at least one DRD including a user interface for receiving passcodes, the DRD registered with said server to access and receive data over a data communications network at the request of a wireless device (WD) for rendering at the at least one DRD in response to a passcode associated with said WD being entered at the user interface;

memory in said server accessible by said DRD, said memory for securely storing data received by or on behalf of said WD and said passcode associated with said WD; and

wherein said server is configured to receive a DRD locator request from said WD through a wireless communications network to find at least one DRD from among more than one DRD registered with said server that is located near the WD and to enable said DRD to be selected by the WD to receive said data from said memory to render said data after at least one passcode is entered on said user interface that

matches said passcode stored in said' memory, provided to said DRD, and associated with said WD.

10. The system of claim 9, wherein said DRD further comprises at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an automatic teller machine (ATM).

11. The system of claim 9, wherein said passcode is provided wirelessly to said user interface by said WD.

12. The system of claim 9, wherein said passcode is alternatively provided to said sever by said WD, whereafter said data is transferred to said DRD and is rendered.

13. The system of claim 9, wherein readiness information for said DRD is provided to said server for enabling at least one of said at least one of said server and said WD to determine if delivery and rendering of data can be accomplished by said DRD prior to selecting said DRD for receipt of said data and said passcode.

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a) and Federal Rule of Appellate Procedure 26.1, counsel for Appellant Ortiz & Associates Consulting, LLC ("Ortiz") certifies the following:

1. The full name of every party represented by the undersigned is Ortiz & Associates Consulting, LLC.

2. None/Not Applicable

3. None/Not Applicable

4. The names of all law firms and the partners or associates that appeared for Ortiz & Associates Consulting, LLC in the district court or are expected to appear in this Court are:

William P. Ramey, III
Susan Kalra
Linda Saltiel
Kyril Talanov
Donald Mahoney
Ramey LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

6.     None/Not Applicable

Date:  August 2, 2024                          /s/ William P. Ramey, III
                                               William P. Ramey, III

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................................1

STATEMENT OF JURISDICTION..................................................................1

ISSUES PRESENTED....................................................................................2

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF RELEVANT FACTS ...........................................................2

SUMMARY OF ARGUMENT ........................................................................5

      I.     There are not Extraordinary Circumstances in the Case Below that Warrant Fees....................................................................................5

      II.    Dismissal Without Leave to Amend Was Sanction Enough.................7

      III.   A Section 285 Sanction is Not a Catch-all Sanction ............................8

      IV.   Ortiz's Litigation History Does Not Support a Section 285 Award .....9

STANDARD OF REVIEW ..............................................................................10

ARGUMENT ..................................................................................................11

      V.    THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THE CASE EXCEPTIONAL AND AWARDING FEES UNDER §285 ..................................................................................................11

          A.   The District Court's Order...............................................................14

          B.   A Section 285 Sanction is Limited to those Rare Cases ..................15

             1. Ortiz Did Not Appeal the Dismissal of the District Court Case, however, the Basis for Such Dismissal is Relevant for this Section 285 Analysis ..................................................................................17

             2. Vizio's Briefing Misled the District Court .......................................18

3. Had Ortiz Been Afforded a Chance to Amend, it Would have Asserted that it Could Show Substantial Compliance ...................... 19

C.  Ortiz Was Not Required to Mark ...................................................... 23

D.  The Policy Reasons for Requiring Marking under §287(a) and the Damage Provision of §286 are Balanced with Encouraging Settlement Without Admitting Infringement ................................... 26

E.  Alternatively, Ortiz Drops its Claims for Products and Only Asserts Methods ............................................................................................. 28

F.  The District Court Imposed a Rule 11-like Sanction on Ortiz Without Due Process ....................................................................... 28

G.  Ortiz's Failure to Seve Certain Pleading or Discovery 7 Months Into a Case Does not Make the Case Exceptional ................................... 33

H.  Ortiz Does Not File Frivolous Suits ................................................. 39

I.  Fees are Not Warranted .................................................................... 40

J.  There is Nothing Inherently Improper About Being a Non-Practicing Entity that Settles Cases for Money ................................................. 41

VI.  CONCLUSION AND RELIEF SOUGHT ......................................... 45

**Cases**

*Associated Plastics Co. v. Gits Molding Corp.*, 7 Cir., 1950, 182 F.2d 1000 .......... 12

*AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353 (Fed. 2017) ...................... 44

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993) .......... 28, 30

*Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633 (Fed. Cir. 2015) ......................... 41

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350 (Fed. Cir. 2017) ................................................................................. 18, 19

*Arctic Cat Inc. v. Bombardier Recreational Products Inc.*, 950 F.3d 860 (Fed. Cir. 2020) ................................................................................. 24, 26

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008) ...................... 42

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371 (Fed. Cir. 2017) .... 33, 43

*ClearValue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291 (Fed. Cir. 2009) ................................................................ 11, 32, 35, 36

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748 L.Ed. 1122 (1908) ....................................................................... 42

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) ......................................................................... 41, 42

*EEOC v. General Dynamics Corp.*, 999 F.2d 113 (5th Cir. 1993) ........................ 31

*Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550 (E.D. Tex. Apr. 6, 2017) .............................................................. 27

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 ........................................... 42, 43

*Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) ............... 44

*Fed. Deposit Ins. Co. v. Maxxam, Inc.*, 523 F.3d 566 (5ᵗʰ Cir. 2008) ............. 11, 31

*Fenner Invs ., Ltd. v. Hewlett–Packard Co.*, No. 6:08–CV–273, 2010 WL 1727916 (E.D.Tex. Apr. 28, 2010) .............................................................. 27

*Hall v. Keller*, D.C.W.D. La. 1949, 81 F.Supp. 835, modified (on other grounds) 5 Cir., 1950, 180 F.2d 753, certiorari denied 1950, 340 U.S. 818, 71 S.Ct. 48 ................................................................................................... 12

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. –559, 134 S.Ct. 1744 L.Ed.2d 829 (2014) ........................................................................ 11, 16

*Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853 (Fed. Cir. 2015)............................11

*Jenkins v. Methodist Hosp. of Dallas,* 478 F.3d 255 (5ᵗʰ Cir. 2007) ............... 11, 31

*King Instruments Corp. v. Perego*, 65 F.3d 941 (Fed. Cir. 1995) ..........................43

*Lans v. Digit. Equip. Corp.*, 252 F.3d 1320 (Fed. Cir. 2001)..................................24

*Lincoln Electric Co. v. Linde Air Products Co.,* D.C.N.D. Ohio 1947, 74 F.Supp. 293, affirmed 6 Cir., 1948, 171 F.2d 223................................12

*Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302 (Fed. Cir. 2016)...................................24

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996) ......................... 18, 19, 20

*Motorola, Inc. v. United States*, 729 F.2d 765 (Fed. Cir. 1984)..............................18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014)..................................... 12, 14, 16, 40

*Park-In-Theatres, Inc. v. Perkins*, 190 F.2d 137 (9th Cir. 1951)12, 13,14, 25, 35, 36, 40

*Phillips Petroleum Co. v. Esso Standard Oil Co.*, D.C.D. Md. 1950, 91 F.Supp. 215, affirmed 4 Cir., 1950, 185 F.2d 672 ........................................................12

*Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017)..........44

*ResQNet,* 594 F.3d at 872 .........................................................................................27

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995)........................42

*Rude v. Westcott,* 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888 (1888).........................27

*SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344 (Fed. Cir. 2015) ..................... 42, 43

*Tex. Dig. Sys. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), overruled in part, 415 F.3d 1303 (Fed. Cir. 2005) ................................................................24

*Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347 (Fed. Cir. 2019).. 40, 42, 43, 44

*Union Nat. Bk. Of Youngstown, Ohio v. Superior Steel Corp.*, D.C.W.D. Pa. 1949, 9 F.R.D. 117.................................................................................................12

*Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 56 S.Ct. 528, 80 L.Ed. 736 (1936) .........................................................................................24

**Constitutional Provisions & Statutes**

35 U.S.C. § 285 ....................................................................1, 31

35 U.S.C. § 286 .............................................................. 22, 27

35 U.S.C. § 287 .......................................................... 5, 22, 23

28 U.S.C. § 1295 ......................................................................1

28 U.S.C. § 1331 ......................................................................1

28 U.S.C. § 1338 ......................................................................1

28 U.S.C. § 1367 ......................................................................1

**Rules & Regulations**

Fed. R. App. P. 26 ............................................................... viii

Fed. R. App. P. Rule 32 .........................................................46

Fed. R. Civ. P. 11 ............................................................ 31, 32

# TABLE OF ABBREVIATIONS

*Parties*

Plaintiff/Appellant     Ortiz & Associates Consulting, LLC

Defendant/Appellee     Vizio, Inc.

*Patents-in-Suit*

The '299 patent     U.S. Patent 9,147,299

The '285 patent     U.S. Patent 9,549,285 ("Patents-in-Suit")

*Defined Terms*

District Court     United States District Court for the Northern District of Texas, the Honorable Judge David C. Godbey

Court of Appeals     United States Court of Appeals for the Federal Circuit

Asserted Claims     Claims 1-6 of the '299 patent and claims 1-13 of the '285 patent

All emphasis in this brief is added unless otherwise indicated.

**STATEMENT OF RELATED CASES**

Each of the consolidated cases has been on a previous appeal:

1. *None.*

The following cases are known to be pending in courts that will directly affect or be directly affected by this Court's decision in the pending appeal:

1. *None.*

**STATEMENT OF JURISDICTION**

The District Court has jurisdiction per 28 U.S.C. §§ 1331, 1338(a), and 1367 and this Court has appellate jurisdiction per 28 U.S.C. § 1295 for all consolidated cases.

This Appeal is an appeal of a fee award under 35 USC §285.[1]

Ortiz & Associates Consulting, LLC ("Ortiz") timely filed a Notice of Appeal on March 26, 2024.[2] An amended notice of appeal was filed on April 24, 2024[3] and a corrected amended notice of appeal was filed on April 26, 2024.[4]

---

[1] Appx00004-Appx00010.
[2] Appx00865.
[3] Appx00867.
[4] Appx00869.

# ISSUES PRESENTED

**1.** Is the failure to plead compliance with Section 287 case dispositive when no opportunity to amend is given by the District Court? Does the rule of reason analysis control a determination of compliance with Section 287 when the entity asserting the patent is a non-practicing entity?

**2.** Is the sanction of dismissal sufficient when leave to amend is not granted in the dismissal of an original complaint when an amendment is capable of curing the deficiencies noted by the District Court? Was it an abuse of discretion for the District Court to find this case exceptional and award fees under 35 U.S.C. §285 when the District Court had not previously granted leave to amend the dismissal of an original complaint when the original complaint is capable of being cured by amendment? Are due process concerns adequately addressed when a District Court dismisses an Original Complaint with prejudice when amendment of the original complaint is capable of curing the alleged deficiencies?

**3.** Are sanctions under Section 285 a broad reservoir of power allowing a District Court to sanction a party twice for the same conduct? Is an alleged pleading violation covered by Rule 11 sanctionable under Section 285 when the litigant is not given the opportunity to cure? Is an alleged discovery

violation covered by Rule 37 sanctionable under Section 285 when the litigant is not provided an opportunity to comply?

## STATEMENT OF THE CASE

This is an appeal of an award of fees under 35 U.S.C. §285 from a patent infringement case where Ortiz & Associates Consulting, LLC ("Ortiz") alleged infringement of claims from the Patents-in-Suit ("the Asserted Patents") by Vizio, Inc. ("Vizio"). Ortiz is not appealing to reinstate its cause of action, not appealing the first sanction, but rather only to have the second sanction, the Section 285 sanction, reversed. Ortiz was *sanctioned* by the dismissal without the chance to amend and the Section 285 sanction in addition to the dismissal is an abuse of discretion under the facts of this case. The District Court's very first Order in the matter was a dismissal with prejudice, without leave to amend. The District Court's next Order was a sanction under §285. Ortiz never had the opportunity to address the District Court's orders prior to dismissal with prejudice and then received a monetary sanction for the same conduct. Ortiz seeks a reversal of that monetary sanction.

## STATEMENT OF RELEVANT FACTS

Plaintiff Ortiz & Associates Consulting, LLC ("Ortiz") sued Defendant Vizio on April 14, 2023, alleging that Vizio infringes U.S. Pat. Nos. 9,147,299

("the '299 Patent") and 9,549,285 ("the '285 patent")(the "Patents-in-Suit").[5] Vizio requested and was granted an extension to respond to the complaint until June 8, 2023. On June 8, Vizio moved to dismiss the Original Complaint.[6] On June 28, 2023, Plaintiff both responded to the motion to dismiss and filed an amended complaint.[7] On June 29, 2024, the District Court, without considering Vizio's First Motion to Dismiss, mooted it.[8]

In the amended complaint, to address Defendant's concerns with the Original Complaint,[9] Ortiz filed a revised claim chart, charting Claim 5, a system claim[10] and specifically alleged infringement of each element.[11] Substantial changes were made to the chart included with the First Amended Complaint in a good faith effort to address alleged issues raised by Vizio. Ortiz did this prior to any Court intervention. Ramey LLP and its lawyers also worked with DynaIP Deal and its technical resources to address Vizio's other alleged issues.[12]

On July 11, 2023, Vizio filed a Second Motion to Dismiss.[13] On November

---

[5] Appx00046 – Appx00051 and Appx00794-Appx00796 at ¶4.
[6] Appx00140 – Appx00169 and Appx00794-Appx00796 at ¶6.
[7] Appx00374 – Appx00378 and Appx00312 – Appx00316, respectively and Appx00794-Appx00796 at ¶7.
[8] Appx00381.
[9] Appx00153 – Appx00157.
[10] Appx00338-Appx00346, *generally*.
[11] Appx00340 – Appx0000346.
[12] Appx00781 – Appx00792 at ¶8.
[13] Appx00395 – Appx00424.

1, 2023, the Court granted Vizio's motion based on the fact that Ortiz did not plead compliance with 35 U.S.C §287's marking requirement, with prejudice.  Ortiz did not appeal the dismissal.

Vizio filed a Motion for Fees on November 15, 2023.[14]  On February 27, 2024, the District Court granted Vizio's Motion for fees.[15]

Ortiz file a Notice of Appeal on March 26, 2024.[16]  Ortiz filed a corrected amended Notice of Appeal on April 26, 2024 appealing:[17]

• The ORDER Dismissing the case of November 1, 2023;[18]

• The Final Judgment;[19]

• The ORDER granting attorney fees on February 27, 2024;[20] and,

• The ORDER granting attorney fees in the amount of $161,777.53 on April 23, 2024.[21]

## SUMMARY OF ARGUMENT

### I.    There are not Extraordinary Circumstances in the Case Below that Warrant Fees

---

[14] Appx00597 – Appx00619.
[15] Appx00004 – Appx00010.
[16] Appx00865.
[17] Appx00869.
[18] Appx00012-Appx00020.
[19] Appx00011.
[20] Appx00004-Appx00010.
[21] Appx00001 – Appx00003.

Ortiz challenges the District Court's granting of a sanction under §285 after the District Court already sanctioned Ortiz by dismissing the case without leave to amend. Ortiz is not seeking to have the dismissal reversed, rather only that the award of fees is vacated as the sanction of dismissal was sufficient[22] and no further sanction was necessary or proper under the facts and law.

First, the District Court abused its discretion in finding the case exceptional and awarding fees under §285. The District Court found the case exceptional, warranting fees based on four findings, that:

1. Ortiz had no viable damages theory;

2. Ortiz failed to comply with discovery deadlines;

3. Ortiz made a settlement demand that was not in line with the merits of the case; and,

4. Ortiz filed numerous suits that were dismissed early without any other evidence.

Whether alone or considered together, these four factors do not, as a matter of law, render the case exceptional.

The Supreme Court's guidance for extraordinary circumstances that merit an award of fees is not met by this case. The facts of this case do not show that Ortiz

---

[22] Ortiz does not agree that the case was properly dismissed but it was and that was not appealed.

brought its claims with surmise and suspicion, rather, the claims were well-grounded and supported. Further, the manner in which the case was litigated was not improper as the case was only 7 months old and there was adequate time for discovery and motion practice. This Court, under the Supreme Court's guidance, should look into the District Court basis for finding that the substantive strength of Ortiz's litigation position and manner in which Ortiz litigated the case merited an award of fees under Section 285. This case does not possess those extraordinary circumstance that merit an award of fees.

## II. Dismissal Without Leave to Amend Was Sanction Enough

The District Court's Order cannot stand as a matter of law. The District Court treated an *alleged* failure to mark, without a chance to amend, as case dispositive. If provided the opportunity, Ortiz would have plead compliance with the marking statute, specifically explaining that compliance. However, Ortiz, as a nonpracticing entity, has no obligation to mark and whether Ortiz has any licensees that are producing a patented article for or under Ortiz's patents is a question of fact under the rule of reason and not proper for dismissal without leave to amend. Moreover, because at least the '285 patent has method claims, Ortiz's damages would not be foreclosed even if a failure to mark was later determined.

Vizio likely contributed to the District Court's error by blatantly misstating the law. Vizio stated a dismissal with prejudice legally functions as a license for purposes of the marking statute. That is a gross misstatement of the law.

The public policies concerning marking under § 287 are balanced with § 286 when parties are allowed to resolve lawsuits without requiring marking. The purposes of § 287 (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented, can be adequately addressed by a settlement licensee without requiring marking, as it is likely that a settlement licensee would not admit infringement and thus have no obligation to mark. Thus, at the pleading stage, the policies of §287 are not violated if marking compliance is not pleaded and can be cured by an amended complaint, if required.

## III.    A Section 285 Sanction is Not a Catch-all Sanction

The conduct complained of by the District Court is covered by other provisions and a section 285 sanction is not meant to be a catch all sanction. However, the District Court's Order finds that Ortiz's case was weak based on an alleged pleading issue covered by Rule 11 and that Ortiz conducted the litigation in an unreasonable manner because of alleged issues with discovery that would be covered by Rule 37. Section 285 sanctions are not to be the norm but rather only for those rare cases, those cases with extraordinary circumstances where it would

be inequitable not to shift fees. Here, the conduct complained of was not sanctionable under any standard, especially absent leave to amend.

## IV. Ortiz's Litigation History Does Not Support a Section 285 Award

The District Court's further finding that Ortiz's settlement offer does not reflect the merits of the case is without basis and an abuse of discretion. It is inconceivable that any court could find an offer of $149,000 at only 7 months into a case as meriting a fee award. $149,000 is not nuisance value, it is twice as much as the median family earned in 2022. The true issue on this point is that patent litigation is unavailable to most patent holders due to its high cost. Patent holders are therefore denied access to the courts even if they have valid infringement claims. Any policy or factor that would serve to deny access to the courts based on value of a case only furthers this injustice. Such a result cannot stand.

There is nothing inherently improper with being a nonpracticing entity ("NPE"). NPE's are subject to the same rules as other parties and the patent statute does not restrict enforceable patent rights to those who practice the patent, even for soon to expire patents, as six years of past infringement damages are potentially available. In this case, the District Court appears to base its exceptional case finding at least in part that Ortiz files many lawsuits and settled them. However, such a finding would not show misconduct on its own. While it is true that "[a] pattern of litigation *abuses* characterized by the repeated filing of patent

infringement actions *for the sole purpose of forcing settlements*, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285." This Court has emphasized "that filing a large number of suits does not, by itself, justify an inference of such an improper motive." Without evidence, this factor cannot be used to find a case exceptional. Here, the District Court acknowledged that Vizio had no evidence and therefore considering this factor was in error.

In today's patent infringement world, another factor that should be considered by the courts are the high costs of patent infringement litigation, which are high enough to take away most patent plaintiff's access to legal representation. Patent litigation has become so expensive as to make it almost impossible for most patent owners to enforce their patents, in large part due to the litigation tactics of parties like Vizio who commonly make the costs higher than necessary.

Balancing these issues, the case was not exceptional.

## STANDARD OF REVIEW

A decision to award attorneys' fees under 35 U.S.C. §285 is reviewed for abuse of discretion as to (1) the substantive strength of a party's litigating position considering both the governing law and the facts of the case or (2) the

unreasonable manner in which the case was litigated.[23] "The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error."[24] An abuse of discretion occurs when a district court's decision commits legal error or is based on a clearly erroneous assessment of the evidence.[25] "A factual finding is clearly erroneous if, despite some supporting evidence, we are left with the definite and firm conviction that a mistake has been made."[26]

The Fifth Circuit recognizes that alleged pleading violations are to be handled under Rule 11.[27]

The Fifth Circuit recognizes that alleged discovery violations are to be handled under Rule 37.[28]

## ARGUMENT

### V. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THE CASE EXCEPTIONAL AND AWARDING FEES UNDER §285.

---

[23] *See, e.g., Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. –559, 563, 134 S.Ct. 1744, 1749, 188 L.Ed.2d 829 (2014).
[24] *Id.* at 563 n.2, 134 S.Ct. 1744.
[25] *Id.* at 1748 n.2.
[26] *Insite Vision Inc. v. Sandoz, Inc.,* 783 F.3d 853, 858 (Fed. Cir. 2015).
[27] *Fed. Deposit Ins. Co. v. Maxxam, Inc.,* 523 F.3d 566, 580 (5th Cir. 2008) ; *Jenkins v. Methodist Hosp. of Dallas,* 478 F.3d 255, 264 (5th Cir. 2007).
[28] *ClearValue, Inc.,* 560 F.3d at 1309.

The United States Supreme Court was clear that an award of fees is not to be a penalty for failure to win a patent infringement suit and is "appropriate only in extraordinary circumstances."[29]   The Supreme Court explained that "[t]he provision enabled them to address 'unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force,' which made a case so unusual as to warrant fee-shifting."[30]   *Octane Fitness* cited application of "extraordinary circumstances" from *Park-In-Theatres v. Perkins*, a case that examined Section 285 five years from when it was enacted, and explained:

> the payment of attorney's fees for the victor is not to be regarded as a penalty for failure to win a patent infringement suit. The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear. The cases support this view. *Phillips Petroleum Co. v. Esso Standard Oil Co.*, D.C.D. Md. 1950, 91 F.Supp. 215, *affirmed* 4 Cir., 1950, 185 F.2d 672; *Associated Plastics Co. v. Gits Molding Corp.*, 7 Cir., 1950, 182 F.2d 1000; *Union Nat. Bk. Of Youngstown, Ohio v. Superior Steel Corp.*, D.C.W.D. Pa. 1949, 9 F.R.D. 117; Hall v. Keller, D.C.W.D. La. 1949, 81 F.Supp. 835, *modified (on other grounds)* 5 Cir., 1950, 180 F.2d 753, *certiorari denied* 1950, 340 U.S. 818, 71 S.Ct. 48; *Lincoln Electric Co. v. Linde Air Products Co.*, D.C.N.D. Ohio 1947, 74 F.Supp. 293, *affirmed* 6 Cir., 1948, 171 F.2d 223.[31]

---

[29] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 549, 134 S. Ct. 1749, 1753, 188 L. Ed. 2d 816 (2014).

[30] *Id.*

[31] 190 F.2d 137, 142 (9th Cir. 1951).

The *Park-in-Theatres* court explained that while Congress gave discretion to the district courts

> But in granting this power, Congress made plain its intention that such fees be allowed only in extraordinary circumstances. The Reports of House and Senate Committees recommending this enactment provided in identical terms that 'It is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits, * * * . The provision is also made general so as to enable the court to prevent a gross injustice to an alleged infringer.' 1946 U.S. Code Congressional Service 1386, 1387.[32]

The *Park-in-Theatres* court then agreed with the district court's determination that it did not find the suit was brought in bad faith and concluded that the district court awarded fees in error because the district court based its fee award on its finding that:

> [t]he pleadings, interrogatories, answers thereto, requests for admissions and admissions thereto, and the objections, motions for extensions of time and other papers on file herein indicate that the action was brought upon surmise and suspicion and plaintiff repeatedly delayed proceedings'.[33]

Next, rather than affording unbridled discretion when looking at the merits, the court of appeals examined whether 'the pleadings, interrogatories, answers thereto, requests for admissions and admissions thereto, and the objections, motions for extensions of time and other papers on file herein indicate that the action was brought upon surmise and suspicion' and determined they were not because the

---

[32] *Park-In-Theatres v. Perkins*, <u>190 F.2d 137, 142</u> (9th Cir. 1951).
[33] *Id.* at 143.

infringement allegation as to the admitted operation of one theater took the allegation out of surmise and conjecture.[34] Second, the court of appeals used its own judgment and determined that while there were delays, such delays were not dilatory.[35] Thus, the 'extraordinary circumstances' that the Supreme Court cites as allowing a sanction under Section 285 do not include conduct where the infringement allegations are not brought with 'surmise and conjecture' and without more than non-dilatory delays. Importantly, the appeals court examined whether the infringement allegation was brought with 'surmise and suspicion' and not whether the district court simply found the case to be such. As well, the court of appeals examined whether the delays were dilatory in nature and determined they were not, supplanting the finding of the district court, under the abuse of discretion standard. This is the standard the Supreme Court approved in *Octane Fitness*, based on Congress's intent.[36]

## A. The District Court's Order

The stated basis for Judge Godbey's Order awarding fees under Section 285 was because the District Court:

---

[34] *Park-In-Theatres v. Perkins*, 190 F.2d 137, 143 (9th Cir. 1951).
[35] *Id*.
[36] *Octane Fitness, LLC*, 572 U.S. at 549, 134 S. Ct. at 1753.

1. agreed with Vizio that Ortiz's position was substantively weak given it knew, or should have known, that its complaint stated no viable damages theory;[37]

2. found Ortiz's litigation conduct unreasonable in that it failed to comply with the Court's discovery deadlines;[38]

3. found Ortiz made a settlement demand not in line with the merits of the case;[39] and,

4. found Ortiz dismissed many lawsuits before discovery commenced and at the motion to dismiss stage.[40]

The District Court issued its Order awarding fees after the case was dismissed with prejudice, without ever providing Ortiz leave to amend its pleading. Yes, the District Court's first order on the case was a dismissal with prejudice, a sanction, without allowing Ortiz an opportunity to cure. The sanction of dismissal, whether proper or not, was sufficient and no further sanction under Section 285 was warranted. The second Order from the District Court was a sanction under Section 285.

---

[37] Appx00006.
[38] Appx00006.
[39] Appx00006.
[40] Appx00007.

Prior to the dismissal, Ortiz did not have any guidance from the District Court that its pleading needed to be amended and the dismissal with prejudice guaranteed that Ortiz would not have the chance to comply with the District Court's reasoned opinion.[41] The case was still at the pleading stage.

## B. A Section 285 Sanction is Limited to those Rare Cases

The Supreme Court has made it clear that an exceptional case is simply one that stands out from others with respect to (1) the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or (2) the unreasonable manner in which the case was litigated.[42] In the present case, the District Court found the substantive strength of Ortiz's litigation position as weak based upon Ortiz's lack of a damages theory.[43] All other justifications for the Section 285 award were based upon the District Court finding that Ortiz litigated the case unreasonably.[44] A court's 285 determination is reviewed under an abuse of discretion standard in part because the Supreme Court recognized that factual determinations are typically at the root of a such motions. However, the Supreme

---

[41] Appx00012-Appx00020, *generally.*
[42] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).
[43] Appx00006.
[44] Appx00006 – Appx00010.

Court further recognized that issues of law may at times be relevant.[45]  Here, the District Court's determination that Ortiz's litigation position was substantially weak cannot stand as Ortiz was not given a chance to amend and its plead claims for infringement of method claims are not affected by the marking statute.  Further, the District Court's finding that Ortiz unreasonably litigated its case cannot stand as such sanctions are covered by other rules and other standards.  In short, the District Court abused its discretion and erred in sanctioning Ortiz under Section 285.

> **1.    Ortiz Did Not Appeal the Dismissal of the District Court Case, however, the Basis for Such Dismissal is Relevant for this Section 285 Analysis**

Ortiz is not appealing to have its case reinstated, rather, when faced with the dismissal with prejudice, Ortiz decided not to appeal that Order.  The underlying dismissal with prejudice was premised on the District Court's determination that Ortiz could not get damages as it had not plead compliance with the marking statute.[46]  However, Ortiz was not given a chance to amend as the dismissal was with prejudice.[47] As this Court has said, Section 287 is not an affirmative defense, but rather a limitation on damages:

---

[45] *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, <u>572 U.S. 559, 564</u>, <u>134 S. Ct. 1744, 1748</u>–49, <u>188 L. Ed. 2d 829</u> (2014).
[46] <u>Appx00115</u> – <u>Appx00019</u>.
[47] <u>Appx00019</u>.

> Section 287 is thus a limitation on damages, and not an affirmative defense. *Motorola, Inc. v. United States*, 729 F.2d 765, 770 (Fed. Cir. 1984). Compliance with § 287 is a question of fact. *Maxwell*, 86 F.3d at 1111.[48]

As such, failure to plead compliance is not an affirmative defense. Irrespective of this Court's clear case law, the District Court's dismissal treated the failure to plead compliance as case dispositive, as an affirmative defense (or other defense). That is not the law from this Court. In fact, *Arctic Cat Inc.* only found that the failure to comply was a limitation on damages and not a fact warranting dismissal at the pleading stage,[49] especially without leave to amend.

## 2. Vizio's Briefing Misled the District Court

Vizio's briefing on its motion to dismiss likely caused much of the issue as it intentionally miscited case law from this Court. Vizio told the District Court that a dismissal with prejudice legally functions as a license for purposes of the marking statute.[50] However, Vizio's pronouncement reads too much into a dismissal with prejudice. While a dismissal with prejudice may function as a *de facto* license as the suit cannot be brought again, it in no way triggers a marking requirement without more.

---

[48] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).

[49] 876 F.3d at 1366.

[50] Appx00409.

Moreover, Vizio, in its original motion to dismiss, never identified any specific products licensed by Ortiz that are alleged to be unmarked.[51] A statement that Ortiz dismissed a lawsuit with prejudice is not enough to articulate the products it believes are unmarked patent articles subject to §287, and as such dismissal does not trigger the marking requirement alone.

In *Artic Cat*, this Court found that the production of a license agreement that licensed the patents to produce a patented article was sufficient to trigger the need to show compliance with the marking requirement.[52] At the pleading stage in this case, Vizio did not come forward with any license agreements or other evidence showing that any prior defendant is producing a patented article for or under Ortiz's patents. Simply providing that a case was dismissed with prejudice is not sufficient to trigger a marking requirement under Section 287, at least at the pleading stage. Through discovery it may well be that a defendant is able to produce evidence showing a requirement to mark, which can then be addressed. However, at the pleading stage, it is enough that a plaintiff pleads compliance with the marking statute, as this Court has held.[53] Ortiz was never given that chance, a chance to amend, and while the decision of Dismissal with prejudice was not

---

[51] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017).
[52] *Id.*
[53] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

appealed, that sanction has a direct bearing on this appeal of the second sanction, the Section 285 sanction.

### 3. Had Ortiz Been Afforded a Chance to Amend, it Would have Asserted that it Could Show Substantial Compliance

Ortiz can show substantial compliance with the marking statute as compliance with §287 is a fact question and not a proper basis for dismissal, if plead.[54]  If allowed to amend, Ortiz would have so plead.  When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement.[55]  Here, Ortiz would have presented evidence that establishes, under the facts of this case, that it did comply with the express language of §287, the exact position it defended in the motion to dismiss, that it did not need to mark.[56] Ortiz should have been allowed to present that evidence.  Ortiz should have been given the chance to amend as it requested.[57]

---

[54] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).
[55] *Id.* at 1111–12.
[56] Appx00574-Appx00575.
[57] Appx00580-Appx00581.

Had Ortiz been afforded a chance to amend, it would have alleged that Ortiz has never sold a product and that upon information and belief, Ortiz's predecessor(s)-in-interest, if any, have never sold a product. Ortiz is a non-practicing entity, with no products to mark. Ortiz has pled all statutory requirements to obtain pre-suit damages. Further, all conditions precedent to recovery are met. Under the rule of reason analysis, Ortiz has taken reasonable steps to ensure marking by any licensee producing a patented article.

Ortiz and its predecessors-in-interest have entered into settlement licenses with several defendant entities, but none of the settlement licenses were to produce a patented article for or under the Ortiz patents. Duties of confidentiality prevent disclosure of settlement licenses and their terms in this pleading but discovery will show that Ortiz and its predecessors-in-interest have substantially complied with Section 287(a). Furthermore, each of the defendant entities in the settlement licenses did not agree that they were infringing any of Ortiz's patents, including the Patents-in-Suit, and thus were not entering into the settlement license to produce a patented article for Ortiz or under its patents. Further, to the extent necessary, Ortiz will limit its claims of infringement to method claims and thereby remove any requirement for marking.

To the extent Defendant identifies an alleged unmarked product produced for Ortiz or under Ortiz's patents, Ortiz will develop evidence in discovery to

either show that the alleged unmarked product does not practice the Patents-in-suit and that Ortiz has substantially complied with the marking statute.  Defendant has failed to identify any alleged patented article for which Section 287(a) would apply.  Further, Defendant has failed to allege any defendant entity produce a patented article.

The policy of § 287 serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented.  These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking. All settlement licenses were to end litigation and thus the policies of §287 are not violated.  Such a result is further warranted by 35 U.S.C. §286 which allows for the recovery of damages for six years prior to the filing of the complaint.

For each previous settlement license, Ortiz understood that (1) the settlement license was the end of litigation between the defendant entity and was not a license where the defendant entity was looking to sell a product under any of the Ortiz's Patents; (2) the settlement license was entered into to terminate litigation and prevent future litigation between Ortiz and defendant entity for patent infringement; (3) defendant entity did not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287; and, (4) Ortiz

believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287 for each prior settlement licensee.

Each settlement license that was entered into between the defendant entity and Ortiz was negotiated in the face of continued litigation and while Plaintiff believes there was infringement, no defendant entity agreed that it was infringing. Thus, each prior settlement license reflected a desire to end litigation and as such the policies of §287 are not violated.

### C. Ortiz Was Not Required to Mark

The award under Section 285 was available, at least in part, because the District Court placed an affirmative duty on Ortiz to have marked its products. However, the marking statute, 35 U.S.C. §287, only allows a patent holder to mark the patent number on a commercial embodiment of its invention so as to give notice of its patent to the general public. This marking can serve to elongate the period during which the patent holder would receive damages for infringement. But the marking statute only applies to "[p]atentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States."[58] Therefore, an individual or entity that does not does not practice the claimed invention – like Ortiz – is not required to plead that it marked its products or otherwise complied with the

---

[58] 35 U.S.C. § 287(a).

marking statute at least until the defendant identifies specific unmarked products.[59] This Court has supported this position by holding that the recovery of damages is not limited by the absence of marking where there are no products to mark.[60] Compliance with the marking statute is a question of fact.[61] Thus, as an entity that does not practice the claimed invention, Ortiz may recover damages even absent notice to an alleged infringer.[62] Ortiz had arguments for why it was not required to mark, such as because Ortiz asserted method claims, but the District Court's dismissal with prejudice ensured those arguments would not be made.  However, such factor is directly relevant in the Section 285 inquiry as it shows that by law Ortiz did not litigate its case in an unreasonable manner.  Thus, the District erred as a matter of law for finding that Ortiz's failure to plead compliance with the marking statute, without being provided the chance to amend, litigated its case in an unreasonable manner and thus cannot support a finding of exceptionality. Even if this Court decides otherwise, Ortiz's pleadings are a good faith effort to change the law and should not serve as the basis for an award of fees. [63]

---

[59] *See Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co*., <u>297 U.S. 387, 398</u>, <u>56 S.Ct. 528</u>, <u>80 L.Ed. 736</u> (1936).
[60] *Tex. Dig. Sys. v. Telegenix, Inc.*, <u>308 F.3d 1193, 1220</u> (Fed. Cir. 2002), overruled in part, <u>415 F.3d 1303</u> (Fed. Cir. 2005).
[61] *See Lans v. Digit. Equip. Corp*., <u>252 F.3d 1320</u> (Fed. Cir. 2001).
[62] *Arctic Cat Inc. v. Bombardier Recreational Products Inc*., <u>950 F.3d 860, 864</u> (Fed. Cir. 2020).
[63] *Mankes v. Vivid Seats Ltd.*, <u>822 F.3d 1302, 1312</u> (Fed. Cir. 2016).

This Court has been clear that a non-practicing entity with no products to mark has no obligation to mark. At the pleading stage, before any evidence is introduced, Ortiz should have been provided the chance to amend if the District Court determined that Ortiz's pleading failed to comply with its obligations under the marking statute. Absent that opportunity to amend, it is an abuse of discretion for the District Court to later award fees under Section 285 based on an alleged failure to mark when as here there is no evidence in the pleadings of an unmarked patented article and Ortiz was not given the chance to amend. Ortiz's infringement allegations were not brought with 'surmise and suspicion' and cannot serve as the basis for a Section 285 award.[64]

Ortiz was denied its due process rights when Vizio was allowed to raise potential licensees in its motion to dismiss, documents outside the original pleadings. The District Court compounded Ortiz's lack of due process by not allowing Ortiz to amend to address the purported licenses, as it would have with the verbiage in Section I(B)(3). How can what is improper for a motion to dismiss support an award of fees as a sanction under Section 285? That crosses the line and is a denial of due process. The issue might have been different if the District Court had provided the chance to amend and then dismissed or had Ortiz not amended when given the chance by the Court, but that is not what happened here.

---

[64] *Park-In-Theatres v. Perkins*, 190 F.2d 137, 143 (9th Cir. 1951).

Therefore, consideration of the District Court's dismissal of the underlying action is relevant to the determination of whether the District Court abused its discretion in awarding fees under Section 285.

### D. The Policy Reasons for Requiring Marking under §287(a) and the Damage Provision of §286 are Balanced with Encouraging Settlement Without Admitting Infringement

The policy of § 287 "serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented."[65]

These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking. Vizio has offered no evidence that the three settlement licenses it identifies were entered into because any of the Defendants believed they infringed Ortiz's patents. Rather, discovery will likely show that none of the Defendants admitted to infringement and thus none of the Defendants would have marked a product as such marking would be false marking.

---

[65] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 865 (Fed. Cir. 2020).

Further, license fees negotiated in the face of a threat of high litigation costs "may be strongly influenced by a desire to avoid full litigation."[66] Such licenses may therefore have little to do with whether the parties to the settlement agreed there was infringement. In fact, the courts have long recognized the differences between settlement licenses and other licenses.[67] In the past, settlement agreements were generally not relevant in a royalty analysis "because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction."[68] District courts routinely exclude settlement licenses because the potential prejudice and jury confusion substantially outweigh whatever probative value they may have.[69] Thus, settlement licenses are not a typical license between parties to product a patent article for or under a patent.

Therefore, as there is no evidence at the pleading stage that any prior settlements were anything more than a desire to end litigation, the policies of §287 are not violated. Such a result is further warranted by 35 U.S.C. §286 which

---

[66] *Rude v. Westcott,* 130 U.S. 152, 164, 9 S.Ct. 463 [468], 32 L.Ed. 888 (1888).
[67] *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *4 (E.D. Tex. Apr. 6, 2017) (While settlement licenses have been used to assess damages in patent litigation, their admittance is never obtained without scrutiny because of the inherent risk they pose in skewing a reasonable royalty calculation. *See ResQNet,* 594 F.3d at 872 (noting that "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation").
[68] *Fenner Invs ., Ltd. v. Hewlett–Packard Co.,* No. 6:08–CV–273, 2010 WL 1727916, at *1 (E.D.Tex. Apr. 28, 2010).
[69] *See, e,g,, id.*

allows for the recovery of damages for six years prior to the filing of the complaint.[70] One statute cannot be read to the exclusion of the other when both can be complied with through an amended pleading.

### E. Alternatively, Ortiz Drops its Claims for Products and Only Asserts Methods.

This Court has long recognized that there is no requirement to patent mark for a method claim.[71] Thus, Ortiz could have and would have dismissed all claims except for the method claims in U.S. Pat. No. 9,147,299 ("the '299 patent"). Claims 1-4 of the '299 patent are directed to methods.[72] As these claims are not directed towards a product, there is no marking requirement. Ortiz would then have been in compliance. Ortiz had already made the District Court aware that it had method claims,[73] claims that are not affected by the marking requirement. Thus, even considering that this Court upholds that Ortiz cannot collect damages on any of its system or apparatus claims, Ortiz had viable claims through the method claims, providing another basis for finding the District Court's Order

---

[70] 35 U.S.C.A. § 286 (West) ("Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action").

[71] *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) (patent marking does not apply to method claims).

[72] Appx00037-Appx00038 at 12:65-14:7).

[73] Appx00574-Appx00575.

awarding fees to be an abuse of discretion.  As a matter of law, claims 1-4 of the

'299 patent would not have been subject to the marking requirement:

> 1. A method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video monitor and multimedia projector for rendering of the video data at a selected rendering device, comprising: ….

> 2. The method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video monitor and multimedia projector for rendering of the video data at a selected rendering device of claim 1, further comprising:….

> 3. A method of brokering data between handheld wireless devices and publicly available data rendering devices for rendering of the data at a selected rendering devices, comprising: ….

> 4. The method of claim 3, ….[74]

That the District Court did not take the method claims into account is a further

showing of an abuse of discretion. There literally was no legal basis for the District

Court to dismiss with prejudice Ortiz's case and then base a Section 285 award on

the same mistakes of law and fact. As a matter of law, the District Court abused its

discretion when it found that Ortiz had no viable claim for damages as at least one

patent had method claims.

### F.  The District Court Imposed a Rule 11-like Sanction on Ortiz Without Due Process

---

[74] Appx00037-Appx00038 at 12:65-14:7.

Contrary to being unreasonable, Ortiz's entire litigation conduct was very reasonable. Ortiz worked with opposing counsel to remove issues before the District Court decided a motion to dismiss.[75] Counsel for Ortiz worked to address concerns, even charting a system claim, but not with prejudice as to the already charted and asserted method claim. The method claim would not have been subject to the marking requirement.[76] Even without amending, Ortiz asserted method claims 1-4 of the '299 patent:

> 8. Defendant maintains, operates, and administers systems, products, and services that performs a method that infringes one or more of claims 1-6 of the '299 patent, literally or under the doctrine of equivalents. Defendant put the inventions claimed by the '299 Patent into service [77]

Thus, even without amendment, Ortiz advanced method claims that as a matter of law were not subject to marking. Further, Ortiz advanced its argument in response to the motion to dismiss that it did not have an obligation to mark.[78] That the District Court disagreed, when Ortiz was not given the chance to amend, does not make the case exceptional. The facts might be different if Ortiz was provided a chance to amend by the District Court but Ortiz refused and maintained the same pleading. However, absent a chance to comply with a duly issued Order, Ortiz's

---

[75] Appx00575 – Appx00580.
[76] *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) (patent marking does not apply to method claims).
[77] Appx00314.
[78] Appx00574 – Appx00575.

conduct, as matter of law, cannot be seen as unreasonable.[79] The proper vehicle to

challenge a baseless pleading is a Rule 11 motion,[80] which was not asserted below.

The District Court's Order finding the case exceptional declared the pleading to be

baseless, but failed to grant leave to amend. Such a result screams for a lack of due

process. If the District Court found the pleading baseless, it should have afforded

Ortiz the chance to amend or withdraw the complaint, as Rule 11 allows:

> (c) Sanctions.
> …
> (3) *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).
> …
> (5) *Limitations on Monetary Sanctions.* **The court must not impose a monetary sanction:**
> (A) against a represented party for violating Rule 11(b)(2); or
> **(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.**
> (6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.
> (d) Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.[81]

In the present case, the District Court issued a monetary sanction under 35 USC

§285, without providing Ortiz the chance to amend. Sanctions for pleadings are

---

[79] *See, e.g., EEOC v. General Dynamics Corp.*, 999 F.2d 113, 116 (5th Cir. 1993)
[80] *Fed. Deposit Ins. Co. v. Maxxam, Inc.,* 523 F.3d 566, 580 (5th Cir. 2008) ;
*Jenkins v. Methodist Hosp. of Dallas,* 478 F.3d 255, 264 (5th Cir. 2007).
[81] Fed.R.Civ.P. 11(c)(emphasis added).

controlled by Rule 11 and the District Court's conversion of a Rule 11 Sanction, without the chance to amend such as through a Show Cause or other order, into a Section 285 award is an abuse of discretion. Just as a court's inherent power is not broad reservoir to sanction a party, Section 285 is not a catch all or other broad reservoir of power that allows a court to sanction based on its discretion when the alleged offending conduct would be covered by another provision.[82] Here, without question, rule 11 covers pleadings. Here, Ortiz was not given a chance to amend.[83] Thus, the District Court sanctioned under Section 285 when it could not have under Rule 11. Perhaps even more egregious is that Rule 11 provides a limitation on the sanction and an opportunity to amend:

> (4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.[84]

Section 285 is far too often used as a gotcha sanction by defendants to cripple patent plaintiffs with viable infringement claims, to further increase the costs of patent litigation and deny access to the courts. That is precisely what has happened

---

[82] *ClearValue, Inc. v. Pearl River Polymers, Inc*., 560 F.3d 1291, 1309 (Fed. Cir. 2009).
[83] Appx00019.
[84] Fed.R.Civ.P. 11(c)(4).

in this case. There is no basis for the District Court to award fees under Section 285 for that which could not be awarded under Rule 11, as Rule 11 controls pleadings. If the District Court believed the pleading was sanctionable, without basis, Ortiz should have been allowed the chance to amend, as Rule 11 allows. Under the facts of the case, considering that Ortiz was not given the chance to amend, it was an abuse of discretion to find Ortiz's pleadings, which asserted method claims, to be substantively weak so as to support an award of fees. The District Court's Order vitiates the presumption that all lawsuits are filed in good faith.[85]

### G. Ortiz's Failure to Serve Certain Pleading or Discovery 7 Months Into a Case Does not Make the Case Exceptional

The District Court's finding that Ortiz failed to:

(1) timely serve infringement contentions;

(2) discovery requests; and,

(3) make a settlement demand in line with the merits of the case,

does not support a finding of exceptionality or otherwise support an award of fees under Section 285 because the case was very young, only 7 months old, and a discovery violation, if appropriate, would be sanctionable under Rule 37. The only evidence before the District Court on this issue was supplied by Ortiz's attorney

---

[85] *Checkpoint Sys., Inc.*, 858 F.3d at 1376.

who specifically provided that "[g]iven the stage of the case when dismissed, a mere seven months, Ortiz and its counsel planned to serve discovery and correct any outstanding issues after the Court ruled on the motion to dismiss so that neither (sp) party expended legal fees if not needed."[86] Thus, Ortiz's legal strategy was to get past the motion to dismiss so no party was burdened with excessive fees prior to serving discovery and correcting its disclosures. Such action cannot be unreasonable as the docket control order from the District Court did not close discovery at or near the time of dismissal.[87] In short, there was more than adequate time for discovery. Moreover, it is reasonable in a patent case to defer fact discovery until after Markman to both conserve resources and limit the issues between the parties. In fact, other courts particularly require such scheduling.[88] The District Court's finding that Ortiz litigated unreasonably because it had not served discovery is an abuse of discretion as discovery was to be served. Regarding the infringement contentions, Ortiz contends that it would have served them by motion as allowed by the local rules, namely Miscellaneous Order 62 at 3-

---

[86] Appx00796.

[87] Appx00563-Appx00565, *generally.*

[88] https://www.txwd.uscourts.gov/wp-content/uploads/Standing%20Orders/Waco/Albright/Standing%20Order%20Governing%20Proceedings%20Patent%20Cases%2004142022.pdf (Judge Albright's rules of practice start discovery the day after the Markman Hearing).

7(b).[89]  It is undisputed that Ortiz supplied claim charts with its Original Complaint[90] and its First Amended Complaint.[91]  This is not a case where Ortiz failed to serve charts identifying its infringement allegations.  It is likely that had Ortiz served discovery and made other motions, Vizio would be seeking fees for responding to those as well.  This is simply litigation, nothing more.  The only evidence before this Court is that the case was young with adequate time for both discovery and motion practice.[92]  Under the test from *Park-In-Theatres v. Perkins*, this case did not have the 'extraordinary circumstances' that allow the award of fees in contravention to the American Rule.[93]  Therefore, this is not a case that warrants fees.

Further, the Fifth Circuit recognizes that discovery violations are to be handled under Rule 37.[94] "Discovery violations are appropriately addressed through the application of *Rule 37*," and recharacterizing discovery violations does not remove the applicability of Rule 37.[95]  Here, a failure to serve infringement contentions as provided in a docket control order when not complained of by the opposing party until a motion under Section 285, should not be a factor considered

---

[89] https://www.txnd.uscourts.gov/sites/default/files/orders/misc/Misc62-3.pdf.
[90] Appx00074-Appx00081 and Appx00102-Appx00108.
[91] Appx00338-Appx00346 and Appx00367-Appx00373.
[92] Appx00796.
[93] *See, e.g.,* 190 F.2d at 142, 143 (9th Cir. 1951).
[94] *Id.*
[95] *ClearValue, Inc.,* 560 F.3d at 1309.

for an exceptional case finding especially when at least certain claim charts had been served.[96] The failure to timely serve infringement contentions would be a discovery violation and may be remedied as allowed under the rules, as Ortiz had planned to do. A Section 285 sanction *is not* a broad reservoir of sanctioning power. Rather, the sanction is limited to those 'extraordinary circumstances,' those rare cases, where it would be inequitable not to shift fees,[97] or, as the Supreme Court has endorsed, when there are 'extraordinary circumstances.'[98] Here, there were viable claims in the operable pleading even assuming that this Court affirmed that Ortiz could not collect damages on its product and apparatus claims.

Perhaps more egregious is that an alleged Rule 37 violation served as the basis for dismissal of the underlying suit and now serves as the basis for a sanction under Section 285. Ortiz's conduct is not believed to have supported dismissal as a sanction[99] and the same conduct, when dismissal was ordered, does not make the case exceptional. The record does not reflect that Ortiz was dilatory in its obligations to warrant a sanction under Section 285.[100]

---

[96] Appx00074-Appx00081, Appx00102-Appx00108 and Appx00338-Appx00346, Appx00367-Appx00373.
[97] cite
[98] *Park-In-Theatres*, 190 F.2d at 142, 143.
[99] *See, e.g.,* 560 F.3d 1291 (Fed. Cir. 2009).
[100] *Park-In-Theatres v. Perkins*, 190 F.2d 137, 143 (9th Cir. 1951).

Notably, the District Court does not allege that there was an inadequate pre-suit investigation in this case. While Vizio may have disagreed with infringement, its fee motion does not assert that there is no infringement or that the claim charts accompanying the complaints illustrate an inadequate pre-suit investigation. It is undisputed that lawyers at Ramey LLP worked with technical resources at DynaIP Deals to develop the claim chart for the Original Complaint and the First Amended Complaint.[101] The case was well prepared and was not brough with 'surmise and suspicion.'

Ortiz does not dispute that the District Court determined that its pleadings were inadequate for failure to comply with the marking provisions of Section 287. Ortiz would have addressed the District Court's Order by amending, had it the chance.[102] However, there is nothing exceptional, it is not an 'extraordinary circumstance,' for Ortiz to make an argument in its response to the motion to dismiss under the facts of this case, even if the District Court later determines otherwise. This is not a case where Ortiz ignored the District Court's Order. Here, the District Court dismissed the First Amended Complaint with prejudice and Ortiz did not have an opportunity to comply with the District Court's Order. Had Ortiz ignored the District Court's Order, the argument here would be very different. The

---

[101] Appx00794 and Appx00795.
[102] Appx00796.

first sanction was the dismissal. The second sanction was the award of fees under Section 285 based on the same conduct. The first sanction was not appealed but the second sanction cannot stand, as it is an abuse of discretion that screams for a lack of due process.

The District Court's further finding that Ortiz's settlement offer does not reflect the merits of the case is without basis and an abuse of discretion. Ortiz made the offer to Vizio on October 13, 2023, for $149,000.[103] For that stage of the case, $149,000 is not nuisance value. In fact, even after the briefing on its motion for fees, Vizio only claims about $162,000. Therefore, Ortiz's demand was perfectly in line with the merits of the case, at that stage. That Vizio claims this is a nuisance value is odd as the case was in its early stages. Moreover, how is it even conceivable that $149,000 is a nuisance value for a case not seven months old with a motion to dismiss outstanding? There are families across the United States that do not make $149,000 in a year, in fact the median income was one-half of that for 2022.[104] The true issue on this point is that patent litigation is unavailable to most patent holders due to its high cost. Patent holders are therefore denied

---

[103] Appx00796.

[104]

https://www.google.com/search?q=average+median+income+for+US+family&rlz
=1C1CHBD_enUS999US999&oq=average+median+income+for+US+family&gs_
lcrp=EgZjaHJvbWUyBggAEEUYOTIHCAEQIRigATIHCAIQIRigATIHCAMQI
RigATIHCAQQIRigATIHCAUQIRigAdIBCDczODBqMGo3qAIAsAIA&sourcei
d=chrome&ie=UTF-8

access to the courts. Any policy or factor that would further serve to deny access to the courts based on value of a case only furthers that injustice. Such a result cannot stand and this factor should not be considered by courts as supporting an award of fees. This Court should do all it can to open the courts to patent owners with valid infringement claims.

Notwithstanding policy reasons, the evidence of record establishes that it is the common practice of Ramey LLP to make settlement offers based on the stage of the case, where the offer will often increase as the case progresses.[105] Ramey LLP has a mission of making patent litigation available to all patent owners with valid infringement claims. Ramey LLP is able to level the playing field by efficiently litigating patent infringement cases . Ramey LLP tries to make patent infringement litigation affordable for those patent infringement cases where the potential damages make the case unattractive to most firms. Ramey LLP believes all meritorious claims can be pursued and all intellectual property owners deserve representation and access to the courts. That Vizio finds itself accused of infringing patents is not a commentary on Ramey LLP but rather the business practices of Vizio.

Public policy certainly disfavors any rule that requires damages in the 7-figures before a patent infringement lawsuit can be brought?

---

[105] Appx00796.

### H. Ortiz Does Not File Frivolous Suits

The District Court erred in making the unsupported finding that Ortiz's history of infringement actions involving the Asserted Patents that have been voluntarily dismissed or were dismissed for failure to state a claim before any discovery commenced supports a finding of exceptionality. [106] The District Court acknowledged that VIZIO has not provided evidence of the number or amount of settlement offers Ortiz made in other cases involving the Asserted Patents.[107] Nor did the District Court develop any of its own. Therefore, the District Court's consideration that cases were filed and dismissed without more is not enough to support a finding of exceptionality and is an abuse of discretion.[108] There simply is no due process in the District Court making assumptions about the dismissed cases. It is difficult to fathom how litigation decisions in another case can be applied subjectively to support a finding of exceptionality under these facts. The District Court cites no evidence from which to draw that Ortiz has a history of filing frivolous lawsuits or that it engaged in litigation misconduct, because there is none.

### I. Fees are Not Warranted

---

[106] Appx00007-Appx00008.
[107] Appx00007-Appx00008.
[108] *Thermolife Int'l LLC*, 922 F.3d at 1362.

Ortiz litigated in a timely and reasonable manner. Fees are not to be awarded "as a penalty for failure to win a patent infringement suit."[109] Here, Ortiz tried at every turn to modify its complaint as requested by the Defendant and would have done the same if provided the chance by the District Court. This is not a case where Ortiz litigated meritless positions but rather a case that is still in the pleading stage. Even though the Court found the pleadings deficient, the sanction of dismissal was more than adequate and no further sanction under Section 285 is warranted. The dismissal was a sanction.

## J. There is Nothing Inherently Improper About Being a Non-Practicing Entity that Settles Cases for Money

There is nothing inherently improper with being a nonpracticing entity ("NPE"), as Justice Kennedy explained:

> An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees.[110]

In fact, this Court has commented on the business of a nonpracticing entity, specifying that "[w]here the patentee is an entity that uses patents primarily to obtain licensing fees, its business objectives are premised on monetary relief being

---

[109] *Octane Fitness,* 572 U.S. at 548-49 (quoting *Park-In-Theatres, Inc. v. Perkins,* 190 F.2d 137, 142 (9th Cir. 1951)).
[110] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396, 126 S. Ct. 1837, 1842, 164 L. Ed. 2d 641 (2006).

sufficient to compensate for infringement."[111] NPE's are subject to the same rules as other parties and the patent statute does not restrict enforceable patent rights to those who practice the patent, even for soon to expire patents as six years of past infringement damages are potentially available.[112] This Court and the Supreme Court have recognized the role that NPE's play.[113]

In this case, the District Court appears to base its exceptional case finding at least in part that Ortiz filed many lawsuits and settled them.[114] However, such a finding would not show misconduct on its own.[115] While it is true that "[a] pattern of litigation *abuses* characterized by the repeated filing of patent infringement actions *for the sole purpose of forcing settlements*, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285."[116] This Court has emphasized "that filing a large number of suits does not, by itself, justify an inference of such an improper

---

[111] *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 650 (Fed. Cir. 2015).

[112] *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1362 (Fed. Cir. 2019).

[113] *See id citing See Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 424–25, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995); *cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

[114] Doc no. 40 at 4-5.

[115] *Thermolife Int'l LLC*, 922 F.3d at 1362.

[116] *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015); *see Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324–28 (Fed. Cir. 2011).

motive."[117] However, the District Court's exceptional case finding is based in part on its determination that "Ortiz has filed and voluntarily dismissed with prejudice a number of cases involving the Asserted Patents before or at the motion to dismiss stage" without any evidence of the value of the settlements or other reasoning for settlement. The District Court admits "VIZIO has not provided evidence of the number or amount of settlement offers Ortiz made in other cases involving the Asserted Patents."[118] The District Court's consideration of this factor is in error as this Court has stated that filing a large number of cases that settle early is not improper.[119]  In fact, the posture of this case shows the exact opposite of what the District Court contends – Ortiz did test the merits of its claim.  As such, the District Court erred in its consideration of this factor.

In this case, prior to dismissal, Ortiz believed the claims of the Patents-in-Suit applied "to the activities of numerous persons, such as numerous sellers of similar products, and [Ortiz believed it had] a legitimate interest in pressing reasonably grounded claims against all [] of them."[120] This is normal patent

---

[117] *SFA Sys.*, 793 F.3d at 1351.
[118] Appx00007.
[119] *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015); *see Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324–28 (Fed. Cir. 2011).
[120] *Thermolife Int'l LLC*, 922 F.3d at 1363 *citing Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017) (distinguishing legitimate "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement" from motivation "to harass or burden an

litigation and not improper. When the District Court dismissed with prejudice, without providing any opportunity to amend its complaint in line with the District Court's requirements, Ortiz decided not appealing was the best option as the District Court made it clear that it did not believe Ortiz could amend its complaint to be in compliance with the District Court's requirements.

As this Court has stated, "there is no minimum damages requirement to file a patent infringement case," and "[a]sserting seemingly low damages against multiple defendants—or settling with defendants for less than the cost of litigation—does not necessarily make a case 'exceptional' under § 285."[121] This Court recognized that a patent plaintiff is able to make patent litigation more affordable by distributing common costs over many suits, thus making each suit worthwhile on lower terms.[122] Moreover, as for settlement amounts, a low figure might simply reflect the small size of an individual defendant's potential liability. Indeed, the figure may result from what the Supreme Court has recognized as the normal, legitimate settlement calculus, which includes consideration of litigation costs: specified as a prediction of the amount of liability, discounted by its

---

opponent"); *and King Instruments Corp. v. Perego*, <u>65 F.3d 941, 950</u> (Fed. Cir. 1995) (recognizing deterrence value of enforcement actions).
[121] *Thermolife Int'l LLC*, <u>922 F.3d at 1363-4</u> *citing AdjustaCam, LLC v. Newegg, Inc.*, <u>861 F.3d 1353, 1361</u> (Fed. Cir. 2017).
[122] *See Id.*

probability, plus the transaction costs of further litigation.[123] However, in today's patent infringement world, another factor that should be considered by the courts are the high costs of patent infringement litigation, which are high enough to take away most patent plaintiff's access to legal representation. Liability and damages experts alone can be several hundred thousand dollars with the costs of even small cases getting into the 7 figures. As such, patent litigation has become so expensive as to make it almost impossible for most patent owners to enforce their patents, in large part due to the litigation tactics of parties like Vizio who commonly make the costs higher than necessary. A court should consider these factors in making a finding of frivolousness to force a modest settlement. Also, there is no evidence, or anything in the record, that Ortiz sought nuisance value settlements while pressing baseless infringement contentions. In fact, the District Court admitted it had no evidence on the issue.[124] Moreover, the District Court never commented on the strength of Ortiz's infringement position, the merits of the case.[125]

In the present case, the evidence before the District Court was that Ortiz worked with opposing counsel to remove potential issues and pressed the unresolved issues through a motion to dismiss, i.e., normal litigation.

---

[123] *Evans v. Jeff D.*, 475 U.S. 717, 734, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369 (Fed. Cir. 2017).
[124] Appx00004-Appx00010 at 5.
[125] Appx00004-Appx00010. *generally*.

## VI. CONCLUSION AND RELIEF SOUGHT

Ortiz & Associates Consulting, LLC seeks a reversal and rendering that the case is not exceptional and an Order relieving it from the District Court's Order awarding attorneys' fees under §285.

Date: August 2, 2024

Respectfully submitted,

**Ramey LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
713-426-3923 (Telephone)

***ATTORNEYS FOR ORTIZ & ASSOCIATES CONSULTING, LLC***

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on August 2, 2024, by electronic means (by email or CM/ECF).

By:    */s/ William P. Ramey, III*
William P. Ramey, III

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)

The undersigned counsel of records for Plaintiff-Appellant, Ortiz & Associates Consulting, LLC, certifies that this Principal Brief of Plaintiff-Appellants complies with the typeface requirement provided in Rule 32(a)(5) and

type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  In preparing this certificate, I relied on word-count program of Microsoft Word 2023.  This Brief contains 10,434 words.

Dated:        August 2, 2024        By:   /s/ William P. Ramey, III
                                          William P. Ramey, III

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORTIZ & ASSOCIATES CONSULTING, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:23-CV-00791-N |
| VIZIO, INC., | § § | |
| Defendant. | § | |

## **ORDER**

This Order addresses VIZIO, Inc.'s ("VIZIO") brief in support of attorneys' fees [41]. This Court previously found this case exceptional and granted VIZIO's motion for reasonable attorneys' fees under 35 U.S.C. § 285. Order (February 27, 2024) [40]. For the following reasons, the Court awards VIZIO attorneys' fees of $161,777.53.

In exceptional cases, a district court may award reasonable attorneys' fees to the prevailing party. 35 U.S.C. § 285. Reasonable attorneys' fees include those expenses incurred in the preparation for and performances of legal services related to the case and nontaxable costs. *Maxwell v. Angel-Etts of Cal., Inc.*, 53 F. App'x 561, 569 (Fed. Cir. 2002). Because the Court has already determined this case to be exceptional, the Court now turns to the reasonableness of the fees requested by VIZIO.

To determine a reasonable fee award, courts calculate a "lodestar" amount by multiplying a reasonable billing rate by the number of hours reasonably spent litigating the successful claim. *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988). This calculation,

ORDER – PAGE 1

however, excludes hours spent on "excessive, redundant, or otherwise unnecessary work" and on nonprevailing claims unrelated to successful claims. *Hensley v. Eckerhart*, <u>461 U.S. 424, 434</u>–35 (1983). The lodestar amount is presumptively reasonable and should be modified only in unusual circumstances. *Watkins v. Fordice*, <u>7 F.3d 453, 457</u> (5th Cir. 1993).

VIZIO asks for $161,777.53 in attorneys' fees. Def.'s Br. in Supp. Atty.'s Fees 3. VIZIO arrived at this calculation by multiplying the hourly rates for four partners, one associate, and three paralegals by the total hours spent litigating this case, plus an additional $294.03 for expenses incurred related to a pro hac vice application.[1] First, the Court determines that the hourly rates in VIZIO's fee calculation are reasonable. Ortiz & Associates Consulting, LLC ("Ortiz") complains that: VIZIO requests attorneys' fees for all hours billed to the matter (as opposed to hours dedicated to the "exceptional portion of the case"), four partners worked on the case, and VIZIO's summary of hours performed does not adequately specify the work performed. Pl.'s Obj. to Atty.'s Fees [43]. VIZIO has provided an invoice specifying all billed hours and descriptions of work performed. Def.'s App. <u>APPX0005</u>–0024 [42-1]. In total, VIZIO's attorneys expended 261.7 hours over around seven months. Def.'s Br. in Supp. Atty.'s Fees 4; Def.'s App. <u>APPX0024</u>. Ortiz does not point to any specific flaws in VIZIO's calculation or reference any specific time entries or invoices showing excessive or duplicative work. The hours expended by VIZIO's attorneys are reasonable for a patent infringement case.

---

[1] Attorneys' and paralegals' hourly rates ranged from $250 to $800 an hour.

ORDER – PAGE 2

Because the Court has previously found this case exceptional, and finds VIZIO's attorneys' fees request to be reasonable, the Court awards VIZIO attorneys' fees in the amount of $161,777.53.

Signed April 23, 2024.

David C. Godbey
Chief United States District Judge

ORDER – PAGE 3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORTIZ & ASSOCIATES CONSULTING, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:23-CV-00791-N |
| VIZIO, INC., | § § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

This Order addresses Defendant VIZIO, Inc.'s ("VIZIO") motion for attorneys' fees under 35 U.S.C. § 285, 28 U.S.C. §1927, or the Court's inherent power [33].  The Court grants in part and denies in part the motion, as set forth below.

### I. ORIGINS OF THE DISPUTE

This motion arises out of a patent dispute between Plaintiff Ortiz & Associates Consulting, LLC ("Ortiz") and VIZIO.  Ortiz brought suit against VIZIO for direct infringement of U.S. Patent No. 9,147,299 Patent ("the '299 Patent") and U.S. Patent No. 9,549,285 ("the '285 Patent") (collectively the "Asserted Patents").  Pl.'s First Am. Compl. ¶¶ 6, 8, 11, 13 [20].  Ortiz has been involved in a number of suits involving the Asserted Patents.  This Court dismissed Ortiz's First Amended Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for twice failing to plead facts sufficient to state a claim for relief.  Order (November 1, 2023) [30].  Now, VIZIO moves for attorneys' fees and to find the case exceptional.

MEMORANDUM OPINION AND ORDER – PAGE 1

## II.  THE COURT GRANTS VIZIO'S MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. § 285

The Patent Act provides that in exceptional cases a district court may award reasonable attorneys' fees to the prevailing party.  35 U.S.C. § 285.  Reasonable attorneys' fees include those expenses incurred in the preparation and performance of legal services related to the case and nontaxable costs.  *Maxwell v. Angel-Etts of Cal., Inc.*, 53 F. App'x 561, 569 (Fed. Cir. 2002).  In addition, a district court has wide discretion whether to award costs under Federal Rule of Civil Procedure 54(d).  *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471 (5th Cir. 2006).  But if a district court does not award costs, it must state its reasons.  *Id.*

An exceptional case "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  A case brought in subjective bad faith or that makes especially meritless claims is exceptional and warrants a fee award.  *Octane*, 572 U.S. at 554.  District courts determine whether a given case is exceptional on a case-by-case basis and in light of the totality of the circumstances.  *Id.*  Factors to be considered include frivolousness, motivation, and objective unreasonableness of a case's factual or legal components.  *Id.* at 554 n.6.  Litigants seeking fees must show the case is exceptional by a preponderance of the evidence.  *Id.* at 557.  Courts do not award attorneys' fees as "a penalty for failure to win a patent infringement suit."  *Id*. at 548.  Rather, the "legislative purpose behind § 285 is to prevent a party from suffering a 'gross injustice.'"  *Checkpoint*

MEMORANDUM OPINION AND ORDER – PAGE 2

*Sys., Inc. v. All-Tag Security S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017). The Court holds that this case is exceptional and awards reasonable attorneys' fees to VIZIO under section 285.

VIZIO argues that Ortiz's position was substantively weak given it knew, or should have known, that its complaint stated no viable damages theory. Def.'s Mot. for Atty.'s Fees 10. The Court agrees. *See* Order (November 1, 2023) [30]. The expired patents could not give rise to future damages, and Ortiz was apprised of the need to plead compliance with 35 U.S.C. § 287(a) to support its claim for pre-suit damages in VIZIO's first motion to dismiss but failed to do so. Def.'s Mot. for Atty.'s Fees 10–11; *see Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350, 1365 (Fed. Cir. 2017) (citing 35 U.S.C. § 287(a)); *Estech Sys. IP, LLC v. Mitel Networks, Inc.*, 2023 WL 6115252, at *7 (E.D. Tex. July 17, 2023), report and recommendation adopted, 2023 WL 6065865 (E.D. Tex. Aug. 2, 2023). Ortiz asserts that it "did not have guidance from the Court on the marking issue" prior to dismissal. Pl.'s Resp. 5. This argument is unavailing because district courts are "not obliged to advise [litigants] of the weaknesses in [their] litigation position." *Blackbird Tech LLC v. Health In Motion LLC*, 944 F.3d 910, 916 (Fed. Cir. 2019). Moreover, the Court finds that Ortiz's litigation conduct was unreasonable in that it failed to comply with the Court's discovery deadlines, including deadlines to serve infringement contentions and discovery requests, and that Ortiz made a settlement demand unrelated to the merits of litigation. *See Blackbird Tech LLC*, 944 F.3d at 916–17 (affirming district court's finding of unreasonable litigation conduct including "nuisance

MEMORANDUM OPINION AND ORDER – PAGE 3

value settlement offers" that were less than the cost of defense and unexcused delays in document production).

Additionally, VIZIO highlights Ortiz's history of infringement actions involving the Asserted Patents that have been voluntarily dismissed or were dismissed for failure to state a claim before any discovery commenced. *See* Def.'s Mot. for Atty.'s Fees 5–8. "[A] pattern of litigation abuses characterized by the repeated filing of patent infringement actions for the sole purpose of forcing settlements, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2017). While "the mere existence of these other suits does not mandate negative inferences about the merits or purposes of this suit," it is a factor to be considered in assessing the totality of the circumstances. *Newegg Inc.*, 793 F. 3d at 1351; *see also Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 963 F.3d 1371 (Fed. Cir. 2020) (quoting *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1360 (Fed. Cir. 2017) ("While [a] district court need not reveal its assessment of every consideration of § 285 motions, it must actually assess the totality of the circumstances."). VIZIO has not provided evidence of the number or amount of settlement offers Ortiz made in other cases involving the Asserted Patents. However, the Court considers that Ortiz has filed and voluntarily dismissed with prejudice a number of cases involving the Asserted Patents before or at the motion to dismiss stage. *See Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1183 (Fed. Cir. 2018) (quoting *Stone Basket Innovations, LLC v. Cook Med. LLC*, No. 1:16-cv-00858-LJM-TAB, 2017 WL 2655612, at *1 (S.D. Ind. 2017) (affirming a district court's finding of a lack of

MEMORANDUM OPINION AND ORDER – PAGE 4

evidence to support litigant filing cases with no intention of testing their merits where the litigant "'participated in each stage of the litigation for nearly two years and tested the merits of its claims.'"); *see e.g.*, Notice of Voluntary Dismissal [11], in *Ortiz & Associates Consulting, LLC v. Panasonic Corp. of North America*, Civil Action No. 1:19-cv-01921 (D. Del. 2020); Notice of Voluntary Dismissal [25], in *Ortiz & Associates Consulting, LLC v. Hisense Co., Ltd.*, No. 1:20-cv-02193 (N.D. Ill.); Notice of Voluntary Dismissal [7], in *Ortiz & Associates Consulting, LLC v. Actiontex Electronics, Inc.*, No. 6:23-cv-00139 (W.D. Tex.); Notice of Voluntary Dismissal [14], in *Ortiz & Associates Consulting, LLC v. Epson America, Inc.*, No. 2:23-cv-00308 (E.D. Tex.).

The totality of the circumstances here, including Ortiz's history of filing and dismissing suits involving the Asserted Patents, failure to comply with discovery deadlines, making a settlement demand below the cost of defense, as well as the substantive weakness of Ortiz's litigation position in the instant case, supports a finding of exceptionality. Accordingly, the Court holds that this case is exceptional and grants VIZIO's motion with respect to reasonable attorneys' fees and costs under section 285.

### III. THE COURT DENIES VIZIO'S MOTION FOR ATTORNEYS' FEES UNDER 28 U.S.C. § 1927

Under 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  An award of attorneys' fees under section 1927 requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court."  *Lawyers Title Ins. Corp. v.*

MEMORANDUM OPINION AND ORDER – PAGE 5

*Doubletree Partners, LP*, <u>739 F.3d 848, 871</u> (5th Cir. 2014).  Sanctions under section 1927 are "'punitive in nature and require clear and convincing evidence' that sanctions are justified."  *Id.* at 872 (quoting *Bryant v. Military Dep't of Miss.*, <u>597 F.3d 678, 694</u> (5th Cir. 2010)).  Further, "[a]n unsuccessful claim is not necessarily actionable."  *Hogue v. Royse City, Tex.*, <u>939 F.2d 1249, 1256</u> (5th Cir. 1991).  The Court holds that attorneys' fees pursuant to section 1927 are not warranted here.

VIZIO argues that Ortiz's counsel should be jointly and severally liable for any attorneys' fees award because they filed Ortiz's complaints without a viable damages theory, failed to prosecute the case, and have a history of filing frivolous lawsuits for several clients.  Def.'s Mot. for Atty.'s Fees 17.  VIZIO seeks sanctions against counsel because it alleges Ortiz is a "shell company" VIZIO suspects may file bankruptcy and avoid paying attorneys' fees awarded here.  *Id.*  The Court does not find that VIZIO's argument is sufficient to show bad faith, improper motive, reckless disregard of duty, or unreasonable multiplication of the proceedings on the part of Ortiz's counsel.  VIZIO additionally argues that it may receive attorneys' fees and costs pursuant to the Court's inherent powers.  *See Chambers v. NASCO, Inc.*, <u>501 U.S. 32, 50</u> (1991).  The Court does not find there is sufficient evidence to show that Ortiz's counsel acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  As such, the Court denies VIZIO's request to hold Ortiz's counsel jointly and severally liable for attorneys' fees and costs under section 1927 or the Court's inherent powers.

MEMORANDUM OPINION AND ORDER – PAGE 6

### CONCLUSION

For the reasons stated above, the Court grants VIZIO's motion for reasonable attorneys' fees under 35 U.S.C. § 285 but denies VIZIO's motion to hold Ortiz's counsel jointly and severally liable for attorney's fees pursuant to 28 U.S.C. § 1927 or the Court's inherent powers.  The Court orders VIZIO to submit the specific fee award it seeks with evidentiary support within 14 days of the date of this Order.  *See* FED. R. CIV. P. 54(d)(2)(B) Advisory Committee Note (1993) ("The rule does not require that the motion be supported at the time of filing with the evidentiary material bearing on the fees. This material must of course be submitted in due course . . . .").

Signed February 27, 2024.

David C. Godbey
Chief United States District Judge

MEMORANDUM OPINION AND ORDER – PAGE 7

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORTIZ & ASSOCIATES CONSULTING, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:23-CV-00791-N |
| VIZIO, INC., | § § | |
| Defendant. | § § | |

## **FINAL JUDGMENT**

By separate Memorandum Opinion and Order of this same date, the Court granted

Defendant VIZIO, Inc's motion to dismiss. It is, therefore, ordered that Plaintiff Ortiz &

Associates Consulting, LLC's ("Ortiz") claims are dismissed with prejudice.  Court costs

are taxed against Ortiz.  This is a final judgment.

Signed November 1, 2023.

David C. Godbey
Chief United States District Judge

ORDER – PAGE 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORTIZ & ASSOCIATES CONSULTING, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:23-CV-00791-N |
| VIZIO, INC., | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendant VIZIO, Inc.'s ("VIZIO") motion to dismiss [24]. Because Plaintiff Ortiz & Associates, LLC ("Ortiz") has not pled compliance with 35 U.S.C. § 287(a)'s marking requirement, the Court grants the motion.

### I. THE PATENT INFRINGEMENT DISPUTE

Plaintiff Ortiz owns by assignment U.S. Patent No. 9,147,299 Patent ("the '299 Patent") and U.S. Patent No. 9,549,285 ("the '285 Patent") (collectively the "Asserted Patents"). Pl.'s First Am. Compl. ¶¶ 6, 8, 11, 13 [20]. According to Ortiz, the Asserted Patents relate to "[s]ystems, methods and apparatuses for brokering data between wireless devices, servers and data rendering devices." *Id.* ¶¶ 6, 11. Ortiz has previously been involved in a number of suits involving the Asserted Patents.[1] Defendant VIZIO is a

---

[1] The Court takes judicial notice of the stipulated dismissals, final judgments, and other relevant docket entries cited in Defendant's Motion to Dismiss [24] as they are matters of public record. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

ORDER – PAGE 1

manufacturer and seller of products that utilize SmartCast™ technology.  Ortiz maintains

that VIZIO's SmartCast™ products utilize methods and processes that infringe on the

claims of the Asserted Patents.  Pl.'s First Am. Compl. Ex. B [20-2], Ex. D [20-4].  Ortiz

brings suit against VIZIO for direct infringement of the Asserted Patents pursuant to 35

U.S.C. §271.  VIZIO moves to dismiss VIZIO's claims under Federal Rules of Civil

Procedure 12(b)(6).

## II.  RULE 12(B)(6) LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, a court must determine whether

the plaintiff has asserted a legally sufficient claim for relief.  *Blackburn v. City of Marshall*,

42 F.3d 925, 931 (5th Cir. 1995).  A viable complaint must include "enough facts to state

a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  To meet this "facial plausibility" standard, a plaintiff must "plead[ ]

factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court

generally accepts well-pleaded facts as true and construes the complaint in the light most

favorable to the plaintiff.  *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).

But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal

citations omitted).  "Factual allegations must be enough to raise a right to relief above the

speculative level ... on the assumption that all the allegations in the complaint are true (even

if doubtful in fact)."  *Id.* (internal citations omitted).

ORDER – PAGE 2

In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff.  *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).  However, a court may also consider documents outside of the pleadings if they fall within certain limited categories.  First, "[a] court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  Second, "[a] written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding."  *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007).  Third, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'"  *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).  Finally, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record."  *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citation omitted); *see also, e.g., Funk*, 631 F.3d at 783 (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "[t]he district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand").

ORDER – PAGE 3

### III. The Court Grants VIZIO's Motion

#### A. No Ongoing or Future Damages Are Available

It is undisputed that the Asserted Patents are expired. Therefore, no ongoing or future damages are available. Pursuant to 35 U.S.C. § 154(a)(2), a patent lasts 20 years from the date the application for the patent was filed, "or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, 365(c), or 386(c), from the date on which the earliest such application was filed." Each of the Asserted Patents claims priority to Patent Application No. 09/887,492, filed on June 22, 2001, now Patent No. 7,630,721. Pl.'s First Am. Compl., Ex. A at 2, Ex. C at 2; *see* 37 C.F.R. §1.78(d)(2). Accordingly, the '299 Patent expired on June 22, 2021, 20 years after that application. The '285 Patent would have expired on the same date, but expired early on January 17, 2021, for failure to pay fees. Def.'s Mot. to Dismiss App., APPX 0121 [25]. The Court takes judicial notice of the respective expiration dates of the Asserted Patents. *See* Fed. R. Evid. 201(b)(2); *see e.g., Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 n.27 (Fed. Cir. 1993); *Funk*, 631 F.3d at 783.

The Asserted Patents could not be infringed — and therefore Ortiz could not sustain any damages — after their expiration. *See Shoffiett v. Goode*, 825 F. App'x 824, 826 (Fed. Cir. 2020) (quoting *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015)) ("When a patent expires, 'the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public.'"). Ortiz's Original Complaint [1] was filed on April 14, 2023, well after the Asserted Patents expired. Accordingly, no ongoing or future damages are available.

ORDER – PAGE 4

### *B. No Pre-Suit Damages Are Available*

Ortiz has twice failed to plead compliance with the marking statute, 35 U.S.C. § 287(a), thereby precluding recovery of any pre-suit damages.  The marking statute requires a patentee to mark any patented article they make or sell, as a form of constructive notice, or directly notify infringers of their patent prior to filing suit to recover pre-suit damages for patent infringement.  *See Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017) ("*Artic Cat I*") (citing 35 U.S.C. § 287(a)).  The marking requirement does not apply to patents covering only process or methods but does apply where a patent covers both method and apparatus or system claims.  *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993).  Notably, while the marking requirement is inapplicable when a patentee does not make or sell patented articles, *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020), a patentee's licensees must comply with the statute where they are "making or selling any patented article for or under [the patentee]." *Arctic Cat I*, 876 F.3d at 1366 (quoting *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (quoting §287(a))).  The patentee must make reasonable efforts to ensure its licensees comply with marking requirements of the marking statute.  *Maxwell*, 86 F.3d at 1111.  In a patent infringement suit, patentees bear the burden of pleading compliance with the marking statute.  *Arctic Cat I*, 876 F.3d at 1366.

The parties dispute whether the marking statute applied to Ortiz in this instance. The Asserted Patents fall under the ambit of the marking statute—the '285 Patent asserts system claims and the '299 Patent asserts both process and system claims.  Pl.'s First Am.

ORDER – PAGE 5

Compl. ¶¶ 6, 11.  Ortiz does not itself sell products that need to be marked, nor are any formal licensing agreements alleged.  Nevertheless, VIZIO contends that Ortiz is subject to the marking statute because its previous dismissals with prejudice of suits against manufacturers selling products that allegedly infringe on the Asserted Patents constitute licenses by operation of law, meaning those products should be marked pursuant to section 237(a).  Specifically, Ortiz agreed to a stipulated dismissal with prejudice of its claims alleging that Roku Inc.'s product "Roku TV" infringed on both Asserted Patents.  Stipulated Order of Dismissal with Prejudice [19], in *Ortiz & Associates Consulting, LLC v. Roku, Inc.*, Civil Action No. 1:18-cv-01265-MN (D. Del. 2019).  Ortiz likewise voluntarily dismissed with prejudice its claims against Panasonic Corporation of North America alleging that its "Viera line of televisions" infringed on the '299 Patent.  Stipulation to Stay, *Ortiz & Associates Consulting, LLC v. Panasonic Corp. of North America*, Civil Action No. 1:19-cv-01921 (D. Del. 2020); Def.'s Mot. to Dismiss App., APPX 0134.  VIZIO argues these voluntary dismissals with prejudice function as licenses to the Asserted Patents for use in the products at issue in those suits.  The Court agrees.

In the patent context, a license has been "described as a mere waiver of the right to sue by the patentee."  *De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 242, (1927).  Further, the Federal Circuit has "on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue[.]"  *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) (citing *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1346 (Fed. Cir. 2001) ("This court has stated that 'licenses are considered as nothing more than a promise by the licensor not to

ORDER – PAGE 6

sue the licensee.'") (quoting *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997))).

Courts have extended this reasoning to conclude that dismissals with prejudice of patent infringement claims function as the equivalent of a license. *See EMG Tech., LLC v. Vanguard Grp., Inc.*, 2014 WL 12597427, at *2 (E.D. Tex. May 12, 2014). Following this logic, Ortiz's dismissals with prejudice of its claims against Roku and Panasonic function as the equivalent of licenses to use the Asserted Patents in the products at issue in those suits. Thus, Roku and Panasonic are functionally Ortiz's licensees selling patented articles, and all three entities are subject to the marking statute. Accordingly, Ortiz was responsible for making reasonable efforts to ensure the patented articles were marked and pleading compliance with the marking statute.

Even if, as Ortiz contends, Ortiz's previous dismissals were not functionally licenses to sell products which fall under the marking requirement, its failure to plead compliance with the marking statute provides an independent basis for dismissal. A patentee bears the burden of pleading compliance with the marking statute. *Arctic Cat I*, 876 F.3d at 1366. Other courts have noted that, "[a] claim for past damages requires pleading compliance with the marking statute — even when compliance is achieved, factually, by doing nothing at all." *Express Mobile, Inc. v. DreamHost LLC*, 2019 WL 2514418 at *4 (D. Del. June 18, 2019); *see also DivX, LLC v. Hulu, LLC*, 2021 WL 4459368 at *5 (C.D. Cal. June 11, 2021) (dismissing claim for pre-suit damages, noting that"[b]y failing to offer any § 287(a) compliance argument, [the patentee] has apparently conceded that the Complaint fails to plead compliance with § 287(a)."); *cf. Estech Sys. IP, LLC v. Mitel Networks, Inc.*, 2023

ORDER – PAGE 7

WL 6115252 at *7 (E.D. Tex. July 17, 2023), report and recommendation adopted, 2023 WL 6065865 (E.D. Tex. Aug. 2, 2023) (patentee sufficiently plead compliance with §287(a) where it pled that it sold no patented articles and complied with all statutory requirements to obtain pre-suit damages).  Ortiz was required to plead compliance with the statute, via facts establishing it marked products or showing that no products needed to be marked, in order to state a viable claim for pre-suit damages.  Ortiz failed to plead compliance in either its Original Complaint [1] or First Amended Complaint [20]. Therefore, Ortiz has failed to state a claim for pre-suit damages.

Dismissal is appropriate where no damages can be recovered.  *See Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001).  Because no damages are available for the period after the Asserted Patents' expiration, and Ortiz failed to state a claim for pre-suit damages, Ortiz has not stated a claim that is plausible on its face.

## CONCLUSION

Ortiz has had two opportunities to plead facts sufficient to state a claim for relief under Rule 12(b)(6). First in its Original Complaint, and again in its First Amended Complaint after being apprised of the pleading deficiencies raised in Vizio's motion to dismiss Ortiz's Original Complaint [16]. Because Ortiz has twice failed or declined to plead facts sufficient to state a claim, the Court grants VIZIO's motion to dismiss, and will by separate judgment, dismiss Ortiz's claims against VIZIO with prejudice.

ORDER – PAGE 8

Signed November 1, 2023.

David C. Godbey
Chief United States District Judge

ORDER – PAGE 9



US009147299B2

## (12) United States Patent
### Ortiz

(10) Patent No.: **US 9,147,299 B2**
(45) Date of Patent: **\*Sep. 29, 2015**

(54) **SYSTEMS, METHODS AND APPARATUSES FOR BROKERING DATA BETWEEN WIRELESS DEVICES, SERVERS AND DATA RENDERING DEVICES**

(71) Applicant: **Luis M. Ortiz**, Albuquerque, NM (US)

(72) Inventor: **Luis M. Ortiz**, Albuquerque, NM (US)

(73) Assignee: **Ortiz & Associates Consulting, LLC**, Albuquerque, NM (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/777,273**

(22) Filed: **Feb. 26, 2013**

(65) **Prior Publication Data**
US 2013/0172011 A1 Jul. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/569,739, filed on Sep. 29, 2009, which is a continuation of application No. 09/887,492, filed on Jun. 22, 2001, now Pat. No. 7,630,721.

(60) Provisional application No. 60/214,339, filed on Jun. 27, 2000.

(51) **Int. Cl.**
*H04W 24/00* (2009.01)
*G07C 9/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G07C 9/00674* (2013.01); *G06Q 10/06* (2013.01); *H04L 63/083* (2013.01); *H04L*

*63/0861* (2013.01); *H04L 67/02* (2013.01); *H04L 67/04* (2013.01); *H04L 67/18* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......................... H04M 1/673; H04M 1/72522
USPC ................. 455/456.1–456.3; 400/62; 700/11; 326/41; 709/224; 710/305; 725/116
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,793,630 A 8/1998 Theimer et al.
5,880,732 A 3/1999 Tryding
(Continued)

FOREIGN PATENT DOCUMENTS

WO WO 00/77979 A2 12/2000

OTHER PUBLICATIONS

The Industry Rushes to Make Bluetooth Printing a Reality, The Hardcopy Observer Jun. 2000.
(Continued)

*Primary Examiner* — Md S Elahee

(57) **ABSTRACT**
Provide dare methods, systems and apparatuses for data brokering between hand held wireless devices (WDs) and data rendering devices (DRDs). DRDs in the form of multimedia devices used for rendering data by printing (e.g. to a networked printer) or displaying video data (e.g., televisions, video monitors, and projectors) are provided with data for rendering at the DRD at the request of WDs. DRDs are capable of receiving data data from a network at the request of a WD and/or directly from a WD as the host and then rendering or displaying the data on devices capable of receiving and processing the data. DRD (e.g. printers and multimedia video devices) can also be controlled by the WD during display of the data and to control display of the data.

**6 Claims, 9 Drawing Sheets**



(51) **Int. Cl.**
  **G06Q 10/06** (2012.01)
  **H04L 29/06** (2006.01)
  **H04W 4/02** (2009.01)
  *H04L 29/08* (2006.01)

(52) **U.S. Cl.**
  CPC .......... **H04L 67/289** (2013.01); **H04L 67/2842**
    (2013.01); **H04L 67/306** (2013.01); **H04L**
    **69/329** (2013.01); **H04W 4/02** (2013.01); *H04L*
    *63/102* (2013.01); *H04L 67/1095* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,000,864 A | 12/1999 | Hanada |
| 6,021,433 A | 2/2000 | Payne et al. |
| 6,026,119 A | 2/2000 | Funk et al. |
| 6,037,991 A * | 3/2000 | Thro et al. .................. 725/116 |
| 6,055,229 A | 4/2000 | Dorenbosch et al. |
| 6,058,106 A | 5/2000 | Cudak et al. |
| 6,058,422 A | 5/2000 | Ayanoglu et al. |
| 6,069,896 A | 5/2000 | Borgstahl et al. |
| 6,073,013 A | 6/2000 | Agre et al. |
| 6,075,812 A | 6/2000 | Cafarella et al. |
| 6,075,987 A | 6/2000 | Camp, Jr. et al. |
| 6,076,099 A | 6/2000 | Chen et al. |
| 6,076,167 A | 6/2000 | Borza |
| 6,285,889 B1 | 9/2001 | Nykanen et al. |
| 6,286,029 B1 | 9/2001 | Delph |
| 6,360,101 B1 | 3/2002 | Irvin |
| 6,363,254 B1 | 3/2002 | Jones et al. |
| 6,377,818 B2 * | 4/2002 | Irube et al. ................. 455/556.1 |
| 6,379,059 B2 | 4/2002 | Kaplan |
| 6,457,078 B1 | 9/2002 | Magro et al. |
| 6,493,104 B1 | 12/2002 | Cromer et al. |
| 6,515,988 B1 | 2/2003 | Eldridge et al. |
| 6,574,266 B1 | 6/2003 | Haartsen |
| 6,591,297 B1 | 7/2003 | Challener et al. |
| 6,625,580 B1 | 9/2003 | Tayama |
| 6,738,841 B1 | 5/2004 | Wolff |
| 6,990,548 B1 * | 1/2006 | Kaylor ......................... 710/305 |
| 2001/0018663 A1 | 8/2001 | Dussell et al. |
| 2001/0047441 A1 | 11/2001 | Robertson |
| 2002/0156708 A1 | 10/2002 | Ronen |
| 2003/0011805 A1 | 1/2003 | Yacoub |
| 2003/0036350 A1 | 2/2003 | Jonsson et al. |

### OTHER PUBLICATIONS

"Texas Instruments to Demonstrate Bluetooth Digital Baseband Technology at The International Bluetooth Congress", Monte Carlo, (PRNewswire) Jun. 9, 2000, 8 pages.

"TROY Group Demonstrates Worlds First Product for Printing from PCs Across a Bluetooth Wireless Link", Santa Ana, CA (Business Wire) Jun. 21, 2000.

Troy Group and InnTechnology Partner to Bring Bluetooth Wireless Printing to Hospitality Industry—Technology Will Allow Cable-Free Connectivity to in-Room Printers, Copiers, and Fax Machines, Santa Ana, CA (Business Wire) Jun. 22, 2000.

\* cited by examiner



FIG. 1



FIG 2



FIG 3



FIG. 4                    FIG. 5



FIG. 6



FIG. 7



FIG. 9                  FIG. 8



FIG. 10



FIG. 11



FIG. 12

Appx00031

1

# SYSTEMS, METHODS AND APPARATUSES FOR BROKERING DATA BETWEEN WIRELESS DEVICES, SERVERS AND DATA RENDERING DEVICES

## PRIORITY TO RELATED APPLICATIONS

This application claims priority as a continuation application to Nonprovisional Patent Application Ser. No. 12/569,739, entitled "Systems, Methods and Apparatuses for Providing Video Data to Data Rendering Devices for Display on Multimedia Video Devices at the Request of Wireless Hand Held Devices," filed Sep. 29, 2009 and is incorporated herein by reference, which is also a continuation of Nonprovisional patent application Ser. No. 09/887,492, entitled "Systems, Methods and Apparatuses for Brokering Data Between Wireless Devices and Data Rendering Devices," which was filed Jun. 21, 2001 and is also incorporated herein by reference, and which is also a continuation of Provisional Patent Application Ser. No. 60/214,339, also entitled "Systems, Methods and Apparatuses for Brokering Data Between Wireless Devices and Data Rendering Devices," filed Jun. 27, 2000.

## TECHNICAL FIELD OF THE INVENTION

The present invention is generally related to the use and management of data retrieved over wireless networks. More particularly, the present invention is related to systems, methods and apparatus for providing data, such as documents and video, to data rendering devices (DRDs) including networked printers capable of printing documents and multimedia devices (e.g., televisions, video monitors, and projectors) capable of displaying video data at the request of wireless devices. Additionally, the present invention related to DRDs in the form of networked printers and multimedia vide© devices capable of receiving and displaying video data from a network at the request of a hand held wireless device and/or directly from a hand held wireless device as the host.

## BACKGROUND

As a result of increased competition and the ongoing convergence of voice and data networks, new solutions and services are becoming available in the wired and wireless communications fields. Third Generation communications technology (also referred to in the art as 3G or IMT-2000), is characterized by high-speed, high-bandwidth services that will support a wide variety of wireless applications, including wireline quality voice and high-resolution video. 3G is an initiative of the International Telecommunication Union (ITU) that seeks to integrate the various satellites, terrestrial, fixed and mobile systems currently deployed and being developed under a single standard or family of standards to promote global communication service capabilities and interoperability after the year 2000.

"Data" is generally refers to information (written, electronic, spoken, seen). As used in the communications field, data generally refers to multimedia such as voice, documents embodying text and graphics, and video information, which is all transportable, generally between terminals, throughout communications networks under standards, protocols and over equipment capable of supporting and managing such data (e.g., 3G, ANSI-41, GSM, SS7, SMPP, TCP, IP). Standards and protocols exist and continue to be developed to improve wireless data communications. For example, the Short Message Peer to Peer (SMPP) protocol is an open, industry standard protocol designed to provide a flexible data

2

communications interface for the transfer of short message data between message centers (e.g., mail servers) and a Short Message Service (SMS) application systems, such as a Wireless Application Protocol (WAP) proxy server, Email gateway or other messaging gateways.

Wireless computing devices (generally known as mobile or cellular phones, smart phones, and laptops) are available that communicate wirelessly through data networks (including cellular digital wireless networks). Many wireless telephones are "Web-enabled." Hand held wireless devices that transmit and receive digital data are referred to as Personal Digital Assistants ("PDAs", with similar devices being referred to as palm or pocket computers). Wireless networks are continuing to be expanded and integrated with new applications and services that are compatible with the growing number of wireless devices entering the marketplace. The capabilities of a cell phone and PDA are being combined into a smartphone.

Network interconnection (connecting one communications network with another) and interoperability (ability of a network to operate with other networks) are becoming even more robust and standardized methodologies in the communications industry. An Integrated Digital Enhanced Network (IDEN) is an example of an enhanced specialized mobile radio network and technology that combines two-way radio, telephone, text messaging and data transmission into one network, reflecting the ease of interconnection between networks. General Packet Radio Services (GPRS) data transmission technology is optimized for "bursty" datacom services such as wireless Internet/intranet and multimedia services. Also referred to as GSM-IP, it enables the connection of wireless device users directly to Internet Service Providers (ISPs). Another complementary service is High Speed Circuit Switched Data (HSCSD), which is well suited for real-time services and transferring larger amounts of data, such as video-based services. Into the GPRS solution has been introduced two new network nodes—the SGSN and the CGSN. SGSN tracks packet capable mobile locations, performs security function and access control. GGSN interfaces with external packet data networks to provide the routing destination for data to be delivered to a wireless device and to send mobile-originated data to its intended destination. The GGSN is connected with SGSNs via an IP-based GPRS backbone network. The trend for the wireless industry is towards an all-IP platform, which unites different standards for wireless services worldwide, and introduces and open, Internet-based platform for integrated data, voice and video services over cellular networks.

Wireless Intelligent Networks (WIN) are generally known as the architecture of the wireless switched network that allows carriers to provide enhanced and customized services for mobile telephones. Intelligent wireless networks generally include the use of mobile switching centers (MSCs) having access to network servers and databases such as Home Location Registers (HLRs) and Visiting Location Registers (VLRs), for providing applications and data to networks, service providers and service subscribers (wireless device users). Local number portability allows wireless subscribers to make and receive calls anywhere, regardless of their local calling area. Roaming subscribers are also able to receive more services, such as call waiting, three-way calling and call forwarding. A HLR is a database that contains semi-permanent mobile subscriber (wireless device user) information for wireless carriers' entire subscriber base. HLR subscriber information includes identity, service subscription information, location information (the identity of the currently serving VLR to enable routing of communications), service restrictions and supplementary services/information. HLRs

3

handle SS7 transactions in cooperation with Mobile Switching Centers and VLR nodes, which request information from the HLR or update the information contained within the HLR. The HLR also initiates transactions with VLRs to complete incoming calls and update subscriber data. Traditional wireless network design is based on the utilization of a single HLR for each wireless network, but growth considerations are prompting carriers to consider multiple HLR topologies.

The VLR is also a database that contains temporary information concerning the mobile subscribers currently located in a given MSC serving area, but whose HLR is elsewhere. When a mobile subscriber roams away from the HLR location into a remote location. SS7 messages are used to obtain information about the subscriber from the HLR, and to create a temporary record for the subscriber in the VLR. Signaling System No. 7 (referred to as SS7 or C7) is a global standard for telecommunications. In the past the SS7 standard has defined the procedures and protocol by which network elements in the public switched telephone network (PSTN) exchange information over a digital signaling network to affect wireless and wireline call setup, routing, control, services, enhanced features and secure communications.

Wireless location based services deployed on wireless networks enable wireless service providers to utilize information regarding the geographic location of wireless devices/callers to provide public safety (e.g., E-911), location-sensitive billing, location-specific information (e.g., advertising) and tracking services. For example, automatic number identification (ANI) and automatic location information (ALI) of a wireless phone is being used together with user location information when a wireless telephone user contacts a 911 call center. With the combination of Global Positioning System (GPS) and HLR technology, user identification and location information makes it easier and faster for police and rescue services to locate someone in distress that is calling from a wireless phone. GPS can be incorporated into wireless systems for use in applications such as personal tracking, navigation and automatic vehicle location technologies.

Enhanced messaging applications have also been developed in response to the convergence of voice and data networks and improving wireless technology. Unified Messaging solutions allow carriers and Internet service providers to manage customer e-mail, voice messages and fax images and can facilitate delivery of these communications to PDAs, telephony devices, pagers, personal computers and other capable information retrieval devices, wired or wireless.

Improved operating systems and protocols allow Graphical User Interfaces (GUIs) to provide an environment that displays user options (e.g., graphical symbols, icons or photographs) on a wireless device's screen. Extensible Markup Language ("XML") is a currently available standard that performs as a universal language for data, making documents more interchangeable. XML allows information to be used in a variety of formats for different devices, including PCs, PDAs and web-enabled mobile phones. XML enables documents to be exchanged even where the documents were created and/or are generally used by different software applications. XML has been shown to effectively enable one system to translate data that another system sends. As a result of data transfer improvements, wireless device GUIs are becoming able to render images that closely represent the imaging capabilities available on desktop computing devices.

Security of data during its transmission over wireless devices has become a growing concern. Improved encryption and user verification technologies enhance fraud prevention with respect to data transmission over networks.

4

Other examples of advancements within the field of wireless communications include the following: The Wireless Internet is generally known as an RF-based service that provides access to the Internet (e.g., WiFi), e-mail and/or the World Wide Web via wireless devices. Wireless IP generally refers to the packet data protocol standard for sending wireless data over the Internet. Wireless LANs (Local Area Networks) are known to utilize wireless transmissions, such as radio or infrared communication instead of phone lines or fiber-optic cable, to connect to data devices. A Wireless PBX is a combination of equipment that allows employees or customers within a building or limited area to use wireless handsets connected to an office's private branch exchange system.

SUMMARY

Although handheld wireless device users are being provided with growing services, applications and multimedia support via access to numerous data networks (wired and wireless), solutions for rendering data in the form of documents and video data provided by, or otherwise retrieved through, networks using wireless apparatuses were severely limited, or practically nonexistent, at the time of the present applications priority date of Jun. 27, 2000. Wireless device users were generally restricted in all data use by small device-based viewers, limited GUI functionality and unavailable or inconveniently located rendering (e.g., printing/display/retrieval) resources to utilize data retrieved through networks.

What was needed then and continues as a need as a result of increased public reliance on wireless data services and the desire for portability" and "information on the go" are new and improved systems, methods and apparatuses for rendering data retrieved through/with wireless devices and otherwise managed by wireless devices. It is believed that various aspects and features of the present invention disclosed in June 2000 addresses some of the developing needs of wireless user and the wireless industry, in particular with respect to managing and rendering video data. It is therefore an object of the present invention to provide methods, systems and apparatuses for data brokering between wireless devices (WDs) and Data Rendering Devices (DRDs). More particularly, it is a feature of the present invention to provides systems, methods and apparatuses that can locate data rendering devices (e.g., networked printers, high definition flat panel television displays, multimedia projectors) and render data at the request and/or under the direction of wireless devices (e.g., PDAs, smart phones, and other data and video enabled handheld devices) to the data rendering devices. Additionally, it is a feature of the present invention to provide multimedia video devices capable of receiving and displaying video data from a network at the request of a hand held wireless device and/or directly from a hand held wireless device as the host.

DRDs can generally be considered "undedicated" rendering devices (e.g., "unassigned" as a resource and/or generally available and open to the acceptance and rendering of data from unfamiliar clients). DRDs can be located generally throughout an enterprise or private campus, or be distributed throughout communities for accessibility by the public. DRDs can be publically available or private and are locatable by and can be associated with WDs given systems and method of the present invention.

In accordance with a feature of the present invention, DRDs can receive data directly from WDs and/or through networks after/with coordination by WDs with networks providing data to DRDs.

In accordance with another feature of the present invention, DRDs can be adapted for facilitating direct wireless communication with a WD utilizing IR and/or RF communication signals.

In accordance with another feature of the present invention, the DRD methods can be included in DRD adapted/network-enabled printers, copiers, video-enabled monitors/televisions, multimedia projectors, and other multimedia-enabled devices.

In accordance with another feature of the present invention, a WD can be used to locate a DRD based on a WD and/or WD user's location.

In accordance with another feature of the present invention, user/WD location information can be determined/provided via networks in communication with a user/WD, and DRD location information can be provided to user/WD via the networks based on user/WD location and/or profile.

Another feature of the present invention allows the network to ver DRD availability (e.g., operational readiness).

Another feature of the present invention can provide users with pass code protected retrieval of data from the DRD. Passcode capabilities can include the use of passwords/passcodes, biometrics and/or communications security (COMSEC).

Another feature of the invention provides for temporary memory at DRDs for storing rendering data. Temporary memory can be cleared/zeroed to irreversibly purge data from DRDs after use.

Another feature of the present invention provides simultaneous display of data at DRDs and WDs, which can be referred to as data mirroring or video mirroring.

In accordance with another feature of the present invention simultaneous display of data can be provided at a DRD by more than one WD.

In accordance with another feature of the present invention, manipulation of data displayed on a DRD can be carried out by at least one WD.

In accordance with another feature of the present invention, a WD can be programmed with IR and/or RF signals and/or associated functionality.

Another feature of the present invention provides more than one transmitting/receiving capability at WDs to enable simultaneous data retrieval from networks and/or DRD communication with WDs.

Another feature of the present invention provides payment/billing methods and systems associated with use of DRDs.

Another feature of the present invention enables more than one WD user to interact with a DRD simultaneously, wherein dedicated computing capability enables multiple WD users to interact with each other and/or displayed data and/or project independent data.

The novel features of the present invention will become apparent to those of skill in the relevant art upon examination of the following detailed description of the invention or can be learned by practice of the present invention. It should be understood, however, that the detailed description of the invention and the specific examples presented, while indicating certain embodiments of the present invention, are provided for illustration purposes only because various changes and modifications within the scope of the invention will become apparent to those of skill in the relevant art from the detailed description of the invention and claims that follow.

### DESCRIPTION OF THE FIGURES

The accompanying figures, in which like references numerals may refer to identical or functionally-similar ele-

ments throughout the separate views are incorporated in and form part of the specification, further illustrate aspects of the present invention and, together with the detailed description of the invention, serve to better explain the principles of, but are not intended to limit, the present invention.

FIG. **1** is an exemplary illustration of an environment wherein aspects of the invention described herein can be deployed;

FIG. **2** is a block diagram illustrating components that can be included in a data rendering device (DRD) in accordance with aspects of the present invention;

FIG. **3** is a block diagram illustrating components that can be included in a wireless device (WD) in accordance with aspects of the present invention;

FIG. **4** is a flow diagram illustrating steps by a WD for selecting and providing data to a DRD;

FIG. **5** is a flow diagram illustrating additional steps of a WD for providing data to a DRD for rendering by the DRD;

FIG. **6** is a flow diagram illustrating steps by a WD for selecting a DRD for transfer of data;

FIG. **7** is a flow diagram illustrating steps by a WD for selecting a DRD using network resources, selecting data for transfer to/rendering by a selected DRD and requesting data transfer/render to the selected DRD;

FIG. **8** is a flow diagram illustrating steps for a WD/user to select a DRD for data transfer via a network and selecting render functions at a DRD;

FIG. **9** is a flow diagram illustrating steps by a network server in processing a request for DRD location information;

FIG. **10** is a flow diagram illustrating steps by a WD for requesting DRD location information, data transfer and data rendering;

FIG. **11** is a flow diagram illustrating steps by a DRD for receiving/rendering data at the request of a WD; and

FIG. **12** is a flow diagram illustrating approval determination steps by a DRD.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Particular configurations discussed in these non-limiting examples can be varied and are cited merely to illustrate at least one preferred embodiment of the present invention and are not intended to limit the scope of the invention.

In accordance with the following disclosure of the present invention, data rendering refers to text, voice, graphics and/or video. Data rendering generally refers to the printing, displaying and/or retrieval of data. Wireless Devices (WD) include mobile phones, PDAs, pagers and other hand held wireless appliances adapted for connectivity to wireless networks and capable of processing data. A Data Rendering Device (DRD) includes data rendering hardware (e.g., printers, copiers, displays, etc.) and multimedia software adapted for rendering data at the request and/or coordination of what can be a previously unknown WD. DRDs can receive data directly from WDs and/or through networks (e.g., wireless, Internet, intranet, etc.) after/with coordination by WDs with networks providing data and support to DRDs. Data Brokering includes the negotiation, management, coordination and/or facilitation of data movement and use between and throughout DRDs, WDs and networks.

Referring to FIG. **1**, an environment is illustrated as an example wherein aspects of the invention described herein can be deployed. An aspect of the present invention provides methods, systems and apparatuses for data brokering between wireless devices (WDs) **6** and Data Rendering Devices (DRDs) **7**. Data brokering can be carried out directly

between WDs 6 and DRDs 7 via local wireless communications including infrared (IR) or radio frequency (RF) technology and/or indirectly via networks 12 through the use of known networking and data formatting protocols. Information related to WDs 6, DRDs 7 and/or WD user's (e.g., subscriber identification, location, accounting, profiles) can be managed by a combination of network servers 15, Home Location Registers (HLRs) 16 and Visiting Location Registers 19. Subscriber information for a WD user can be kept in at least one HLR 13 and/or VLR 19, but can also be generated by the WD 6 (e.g., stored in the WD or provided together with a network request by WD user). Subscriber information can include a profile regarding DRD usage (e.g., restriction regarding geography, hardware capabilities, security, biometrics, etc). A WD 6 user is typically in communication with a supporting network 12 through wireless network communications hardware such as cellular antennas 16, Base Station Controllers (BSCs) 17 and Mobile System Controller (MSCs) 18. A copy of a WD 6 user's subscription information can be kept in a VLR 19 associated with the area and MSC 18 the user is operating during communication. Satellite global positioning system (GPS) 9 capabilities installed at the wireless network interface can assist in determining a WD 6 user's location by routing location information to the VLR19/HLR 13 when a WD user communicates with a supporting wireless network 12. A WD 6 user will generally retrieve data from multimedia database resources 8 available or accessible to the WD and WD user over networks 12. Examples of multimedia resources include messaging mailboxes and Internet/intranet information.

In accordance with another aspect of the present invention data brokering can be accomplished directly between WDs and DRDs (e.g., locally via infrared (IR) or radio frequency (RF) technology) or can be negotiated with and provided through networks using available networking protocols. Referring to FIG. 2, a block diagram of some of the components that can be included in a DRD 7 is provided. A DRD 7, serving as an apparatus adapted for rendering data associated with a data rendering request issued by a WD 6, includes an authorization module 21, communications means 23, rendering means 25, and a microprocessor 24. The authorization module 21 approves receipt of rendering data in accordance with a request initiated by a WD 6. The authorization module 21 can approve or deny the request to render data based on the DRDs 7 readiness status 27. A status monitor 27 can be provided to track the operational readiness of the rendering means 25 (which can include printing, display and retrieval hardware status, and microprocessor 24 load/communications activity). The communications means 23 can provide a DRD 7 with wired and/or wireless communications with networks 28 and/or wireless devices (as generally described and illustrated in FIG. 1 and as further known in the wireless communications art). Wired communication via communications means 23 can occur through known data network communications hardware, methods and protocols (e.g., cable modems, Ethernet, Bluetooth, etc.). Wireless communication via communications means 23 can occur through known wireless data network communications hardware, methods and protocols (e.g., Bluetooth, WLAN, 802.11b, etc.). The network communications means 28 can provide DRD 7 communication capabilities over, for example, the public service telephone network (PSTN), digital subscriber line (DSL), Integrated Services for Digital Networks (ISDN) and/or Local Area Network (LAN). DRD 7 can also communicate with networks via wireless means (e.g., cellular, satellite, microwave, etc.) A user's direct interaction with a DRD 7 can be provided through a user interface (UI) 22 associated with

the DRD 7. The UI 22 can allow users to control (e.g., manage) and manipulate (e.g., interact with) data at the DRD 7. The UI 22 can be used to provide user passcodes (including biometrics) directly to the DRD 6 in order to receive rendered data from the DRD 7. Alternatively, a user can interact directly with the DRD 7 via a WD 6. A WD 6 can provide commands and/receive data from the DRD 7 through IR and RF means. IR and RF data transport and communication hardware and protocols are known in the art and can be used for local communication between WDS 6 and DRDs 7. Memory 30 is also available at the DRD 7 to store applications, data, DRD profile information, passcode-related tools and other information and tools necessary for the DRD 7 to operate and communicate. The microprocessor 24 provides management and control over the DRD 6 and its components. Management and control over the DRD 7 and data can be through the UI 22 and/or WD 6.

DRDs 7 can be easily locatable using network 28 resources and/or WDs 6. Information related to a DRD's physical location and rendering capabilities, for example, can be registered at network 28 resources (e.g., an HLR) supporting network communication with the DRD 7. DRD information regarding capabilities can also be held within DRD memory 30 for retrieval by the network and/or WD 6. In accordance with this aspect of the present invention, WD proximity-based DRD locating/finding technology should enable WD users to locate available DRDs 7 based on a DRD's 7 proximity to the roaming WD's location (e.g., determinable by GPS) and/or profile information. Profile information related to the DRD 20 can be provided from memory 30 at the DRD 20 and/or through the network 28. User/WD 6 location information can be determined via networks in communication with the user's WD 6. The user can choose to render data at the DRD 7 suggested by the network. Several DRDs can be identified by the network 28 for selection by the WD user. DRD brokering and location functionality can be included in familiar rendering devices (e.g., Internet Kiosks, printers, photocopiers, fax machines, automatic teller machines (ATMs), video monitors, projectors used in conference rooms and other multimedia-enabled devices) that are IR, RF and/or network communication enabled. DRDs can be public or exclusive to an enterprise. Other DRD compatible devices are foreseeable given the various aspects of the present invention taught herein.

A block diagram of some of the components that can be included in a WD 6 are illustrated in FIG. 3. Referring to FIG. 3, a WD 6 will include a communications means 31, microprocessor 35, and memory 36. The communications means can include IR 32, RF 33 and mobile network RF communications modules 34. The WD 6 can have a broad RF 33 and/or IR 32 signal recording/learning capabilities under the control of the microprocessor 35 utilizing the WD memory 36 for signal storage. The WD can be programmed/provided with unique control functions and/or signals applicable to a particular DRD 7 selected for use by the WD 6. Control functions can be recorded by the WD 6 memory 36 after being obtained by the communications means 31. A WD 6 can be provided with unique DRD control signals from the network or by requesting a temporary copy of DRD 7 control functionality directly from the DRD 7, in which case the DRD 7 can upload, via IR or RF communication, a copy of DRD programmable functions to the WD. It would be desirable for basic DRD functions and signaling to become standardize so that WDS and DRDs can interact with ease. WD and DRD location information can be coordinated/facilitated with the assistance of a locator module 37. The locator module 37 can be used to incorporate device-based GPS resources and/or to

store locator programs and functions. The memory **36** can be used to store, for example, data, profile information, passcode information (including COMSEC) and programmable functions associated with IR and RF control over and communication with remote controlled devices (in addition to the DRD).

In addition to memorizing DRD **7** control signals and functions, a WD **6** having signal recording capabilities can be programmable to facilitate user control over other devices having wireless remote control capabilities. A WD **6** can learn device signals and functions associated with controlled devices by being programmed with applicable remote control signals. RF/IR signals can be learned and stored in WD memory and associated functionality can be assigned to optional/additional WD menu functions or UI controls. A WD can thereby be adapted to communicate with diverse remote controlled devices (e.g., secured entry (garage doors, gates, etc.), entertainment devices (games, TV, audio) and alarm control (home, vehicle)).

Another aspect of the present invention can provide users with passcode protected retrieval of data from the DRD **7**. The passcode can be provided to the DRD **7** prior to data rendering and/or retrieval from the network **28**. The authorization module **21** can facilitate passcode interaction at the DRD **20**. A user can provide passcode information at the UI **22** and/or through a WD **6**. The passcode can be verified at the network **28** (e.g., HLR) or by the DRD **7** (e.g., referencing DRD memory **20**). Passcode information and verification can include the use of biometrics (e.g., voice, retinal, fingerprint) and/or communication security (COMSEC) methods. Passcode control can also be provided over use of the WD **6**. For example, a passcode can be required before a WD user can use the WD to communicate with and control diverse remote controlled devices as described above (e.g., controlling security alarms and secured entry devices).

Referring again to FIG. **2**, a temporary memory **20** can be located at the DRD as a means for providing additional dedicated security over user data. The temporary memory **20** can be used for temporary storage of user data provided to the DRD **7** for rendering on behalf of the WD user. The memory **20** holding the data can be permanently cleared of the data (also referred to "zeroing" the memory) through methods known in the art (e.g., electrical potential used to clear electronic memory registers). Zeroing the memory will ensure that data can not be reused by a subsequent user of the DRD. Memory **20** can be cleared upon: termination of use by the user, after a period of time (e.g., based on failure to render data or log-off) and/or upon user selection of a memory clearing operation at the DRD.

Methods of communications security (COMSEC) can also be incorporated into the DRD **7** to provide secure retrieval/use of data. Using encryption/decryption (also referred to as cryptography or "Crypto") methods, a user can be required to provide a DRD **7** with decryption codes to render data. Encryption/decryption coding can be provided by the network **28** (service provider) with data being transmitted at the request of the WD **6**. The network **28** can generate data in encrypted form and provide the encrypted data to the DRD **7** through the network **28**. The network can also provide the WD **6** (e.g., can be stored in WD memory **36**) with decryption codes needed to render encrypted data at the DRD **7**. The user can transmit decryption codes to the DRD **7** directly via the WD **6** (e.g., IR or RF transmission).

Another aspect of the present invention provides simultaneous display of data at DRDs and WDs, which can be referred to as data mirroring or video mirroring. Such capability can be most relevant where WDs and DRDs possess

compatible display technologies. In accordance with simultaneous display, another aspect of the present invention enables WD **6** control and/or manipulation of data displayed on a DRD **7**. WD **6** control can be provided via IR/RF communication with a DRD. The WD **6** can host the networks retrieval of data for redisplay on DRD **7** via simultaneous WD-DRD communication (e.g., IR and/or additional RF capacity) and/or WD-network communication via cellular RF capability. Simultaneous network and DRD communication by the WD **6** would be possible where more than one RF transmitter/receiving capability can be provided with the WD **6** (as shown in FIG. **3**).

Another aspect of the present invention provides a payment mechanisms and/or billing methods associated with DRDs. Payment mechanisms can be incorporated at the DRD **7** and managed by the microprocessor **24** and authorization module **21**. A DRD **7** can accept currency and/or provide for electronic debits (e.g., e-money, account debits, etc.) through the payment mechanism. For example, an ATM machine can provide DRD capabilities and allow users to be billed a transaction fee via bank account cards (e.g., ATM, Debit and Credit cards). Another public device that can provide DRD capabilities are public telephones, which can allow users to make rendering related transaction payments via payment mechanisms or be billed via communication service accounts or arrangements. The DRD can also authorize operations through billing arrangements (e.g., prepaid services). DRD services/capabilities do not have to be billed to a WD/DRD user in company environments where the users and/or WD is recognized, by the network and/or DRD, as an authorized member of an organization. An example of a device that is generally available throughout large organizations and that can be suitable for DRD applications is a photocopier.

Another aspect of the present invention can enable office hardware such as photocopiers, printers, PCs, monitors, multimedia projectors, and TV monitors to be incorporated with DRD methodologies described herein. For example, presentation projectors typically used in conference room scenarios are already generally capable of being connected to laptops for the purpose of displaying electronic information. DRD compatible software and hardware can be integrated within and/or connected to a multimedia projector to enable a WD to display data via the projector. Another aspect of the presentation in such a setting would allow several WD users to interact with the DRD simultaneously. Simultaneous, multi-WD user interaction together with dedicated computing capability can enable conference participants to interact with each other and displayed data and/or project independent data for comment by participants. In accordance with another aspect of the present invention, computing capability necessary to host a multi-WD user session with a DRD can be provided via networked or dedicated DRD processing capabilities (e.g., a host computer or network connection to the DRD) or via a user's WD acting as the host of the multi-WD session. The host could generally be responsible for presenting the data (e.g., the image of interest to the audience) and selectively archiving participant changes and/or multi-WD interaction with the data.

In accordance with aspects of using the present invention methods of use now be described. Referring to FIG. **4**, a WD user can generally render data at an unassigned DRD by selecting data for rendering using a WD **41** (e.g., through the WDs associated UI). Once data has been selected, the user issues a command at the WD to provide data **42** to the DRD. Data can be provided directly to the DRD by the WD, or via a network supporting the WD.

Referring to FIG. **5**, when a WD is providing data directly to a DRD (e.g., via IR or RF communications) some additional steps can be required by the WD prior to providing data to the DRD. After the user selects data at the WD **51**, but before data is provided to the DRD **53** at the direction of the WD, the WD achieves communication with the DRD **52**. Once communication has been established **52**, the WD provides the DRD with data **53**. The DRD can verify to the WD **54** that it received the data. The DRD then renders the data **55** after it is received (generally at the command of the user).

A WD user can generally invoke the services of any DRD, public or private, using methods of WD, DRD and Network interaction further described below. A WD user can render the data directly at the DRD if its location is known to the user, or the user can request networks in communication with the WD for assistance in locating an appropriate DRD, DRD location can be based on the user's location or a user's (or hand held wireless device's) proximity to DRDs (known because of location in dose proximity to the DRD (as in the same room), or determinable by the network or WD) and/or can be based on user requirements provided to the network or embodied in a WD user profile.

Referring to FIG. **6**, a user selects data for rendering at a WD **61**. If the user does not know the location of a DRD, the user can request network assistance in identifying the location and/or capabilities of a DRD **62**. Once an acceptable DRD has been selected, the user can request the network to transfer the data to the DRD **63**. Referring to FIG. **7**, the WD can first be used by the WD user to request network assistance in locating an appropriate DRD **71**. After the DRD has been located **71**, data for rendering can be selected at the WD **72** and the network requested to transfer the data to the DRD **73**.

Prior to actual transmission of data to the DRD, the DRD can require security passcode (e.g., including any of: passcode, biometrics and/or COMSEC) for transfer and rendering to occur. The WD device user can provide the passcode at the DRD's physical location prior to data transfer and rendering. Referring to FIG. **8**, data is selected at the WD for transfer to a DRD via networking **81**. Data is then transferrable to the DRD via network **82**. Although data can be transferred and eventually rendered at the DRD **84** without a passcode, a passcode can be required **83**. The passcode can be entered at the DRD prior to data transfer **82**, or prior to data rendering **84** at the DRD. If a passcode is required, data will be rendered by the DRD **85** after the passcode has been entered. The passcode can be entered using a DRD user interface or via direct (local) communication to the DRD by the WD.

When the network is requested to assist the WD in locating a DRD, the network can select a DRD for the WD based only on the WDs proximity to the DRD. The network, however, can utilize more than just a WD x, y location within a geographic region based on GPS to find an appropriate DRD for the WD. DRD selection can be based on a profile. Referring to FIG. **9**, a network server can receive a request from a WD for DRD location based on a profile **91**. Profile information can be located in a database (HLR) accessible to the server and/or transferred by the WD as part of the request for assistance. The profile can include new requirements issued by the user regarding locating an appropriate DRD. After the server receives the request, the server locates and identifies a DRD to the WD matching the profile **92**. The server sends DRD location information to the WD **93**. DRD location information can include address information, driving directions and/or a map. Such information is already available from some Internet websites providing directions/maps. With the present invention, however, the user does not have to provide known WD location information. The server can utilize WD location

information known by the server (e.g., based on GPS) to generate directions and/or maps provided to the WD to locate the appropriate DRD.

Referring to FIG. **10**, a flow diagram of DRD location and data delivery is illustrated. At the WD the user wanting to render data at a DRD can request the network to find a DRDs location **101**. A network server will assist the WD as provided in FIG. **9**. The WD will receive DRD location information provided by the network **102**. After DRD location is determined, the WD can have data delivered to the DRD either: directly from the WD **103** after physically locating the DRD, or via a request for data delivery through the network **104**. If data is provided directly from the WD to the DRD, data can be rendered by the DRD **107** after receiving the data transferred by the WD. If data delivery through the network **104** is chosen, the WD/user can be required to enter a passcode to the DRD **105** prior to receiving data delivery at the DRD **104** and/or prior to requesting rendering to the DRD **106**. After the rendering request is provided **106**, and appropriate passcode authorization received **105** (if applicable), the DRD renders the data **107**.

Referring to FIG. **11**, The DRD can be required to verify/authorize data receipt and/or rendering. The request for data receipt and/or rendering can be initiated by the WD/user at the DRD **111**. The DRD can request the WD/user to enter a passcode **113** either before the DRD receives data **112**, or before data is requested by the WD/user to be rendered by the DRD **114**.

Although a DRD may seem appropriate for temporary assignment to the WD/user for data rendering because of its proximity to and/or profile match with the WD/user, it may not be available for rendering. For example, a DRD may not be available for rendering because it is out of service or has already reached its schedules/queued/potential capacity for data delivery/rendering based on a report by dedicated status monitoring means at the DRD. Referring to FIG. **12**, a DRD receives a network request for the DRD to receive/render data **121** associated with a WD. The DRD will verify its availability and either approve or deny delivery **122**. If delivery is denied, a rejection is provided to the network **123** (e.g., to the requesting server). If the DRD accepts delivery/rendering an approval is sent to the network **124**. The network can then send data to be received by the DRD **125**. The DRD can then render the data in accordance with other described methods.

The embodiments and examples set forth herein are presented to best explain the present invention and its practical application and to thereby enable those skilled in the relevant art to make and utilize the invention. The skilled in the art, however, should recognize that the foregoing description and examples have been presented for the purpose of illustration and example only. Other variations and modifications of the present invention will be apparent to those of skill in the art, and it is the intent of the appended claims that such variations and modifications be covered. The description as set forth is not intended to be exhaustive or to limit the scope of the invention. Many modifications and equivalent variations are possible in light of the above teaching without departing from the spirit and scope of the following claims. It is contemplated that the use of the present invention can involve components having different characteristics. It is intended that the scope of the present invention be defined by the claims appended hereto, giving full cognizance to equivalents in all respects.

What is claimed is:

**1**. A method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video

monitor and multimedia projector for rendering of the video data at a selected rendering device, comprising:

receiving a request in a wireless data communication network from a wireless device (WD) to locate at least one data rendering device (DRD) in the form of at least one of a video monitor and multimedia projector for rendering video data selected at said WD, said request including WD location information;

said wireless data communication network identifying a physical location, operational readiness and rendering capabilities of at least one DRD for said WD based on the WD location information;

said wireless data communication network providing said WD with location information of at least one accessible DRD for selection by said WD; and

receiving from said WD via said wireless data communication network a selection of a DRD by entry of authorization code at a user interface on at least one of said WD and said DRD once the DRD is physically located, and video data selected from at least one of said WD or a server accessible by said WD for rendering at said DRD, wherein verification of the authorization code entered on the user interface causes said DRD to retrieve and render the video data.

**2**. The method of brokering video data between handheld wireless devices and publicly and privately available data rendering devices in the form of at least one of a video monitor and multimedia projector for rendering of the video data at a selected rendering device of claim **1**, further comprising:

controlling rendering of said video data on said DRD with the commands from said WD entered on the user interface.

**3**. A method of brokering data between handheld wireless devices and publicly available data rendering devices for rendering of the data at a selected rendering devices, comprising:

receiving a request at a network resource from a wireless device (WD) through a wireless communications network to locate at least one data rendering device (DRD) that is available to and accessible by the public for rendering data selected at the wireless device, said request including WD location information;

said network resource determining the geographic location of said WD using at least one of GPS, accessed network identification, and network triangulation, and then identifying a physical location and rendering capabilities of at least one DRD for said WD based on the WD location information;

said network resource providing said WD with location information of at least one publicly accessible DRD for selection by said WD;

receiving from said WD at said network resource a selection of a DRD and data selected for rendering at said DRD; and

providing said video data to said DRD after an authorization code provided by said WD is verified by at least one of said DRD or said network resource.

**4**. The method of claim **3**, wherein said DRD further comprises at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an ATM machine.

**5**. A system for brokering data between handheld wireless devices and data rendering devices for rendering of the data at selected rendering devices, comprising:

a network resource programmed to:

receive requests from wireless device through a communications network to locate at least one data rendering device located geographically near and lacking physical proximity to said requesting wireless device, wherein said data rendering device is to be used for rendering data selected through said requesting wireless device;

identify physical locations and rendering capabilities of at least one data rendering device that is available to and accessible by the public for said requesting wireless device based on geographic location information for said requesting wireless device as determined by at least one of GPS, network connection, and network triangulation;

provide said requesting wireless device with location information of at least one publicly accessible data rendering device for selection by said requesting wireless device to render the data selected through said requesting wireless device;

receive data rendering device selections from said requesting wireless devices and data selected for rendering at selected data rendering devices; and

provide at least one authorization code to said requesting wireless device, said at least one authorization code for entry at a user interface on at least one of said request on wireless device or on said selected data rendering device once said selected data rendering device are physically located;

wherein said data selected for rendering is transferred at the request of a user of said requesting wireless device to a selected data rendering device from a memory associated with said requesting wireless device, and wherein said data is transferred to said requested data rendering device for rendering and wherein said requested data rendering device renders said data after said at least one authorization code provided by said requesting wireless device is verified by at least one of said network resource and said requested data rendering device.

**6**. The system of claim **5**, wherein said selected data rendering device includes at least one of a printer, a video monitor, an Internet Kiosk, a multimedia projector, or an ATM machine.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 9,147,299 B2                         Page 1 of 1
APPLICATION NO.  : 13/777273
DATED                : September 29, 2015
INVENTOR(S)      : Luis M. Ortiz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page:

(57) Abstract, line 8, please delete the second "data";

In the Claims:

Column 14, Claim 3, line 1, please delete "video".

Signed and Sealed this
Twenty-third Day of February, 2016

Michelle K. Lee
*Director of the United States Patent and Trademark Office*